# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

ANDARY v USAA CASUALTY INSURANCE COMPANY

Docket No. 164772. Argued March 2, 2023 (Calendar No. 4). Decided July 31, 2023.

Michael T. Andary, conservator and guardian of Ellen M. Andary; Ronald Krueger, guardian of Philip Krueger; and Moriah, Inc., doing business as Eisenhower Center, brought an action in the Ingham Circuit Court against USAA Casualty Insurance Company and Citizens Insurance Company of America, seeking a declaratory judgment that the Legislature's 2019 amendments of the no-fault act, MCL 500.3101 *et seq*., that placed new limitations on in-home family-provided attendant care in MCL 500.3157(10) and the non-Medicare fee schedule of MCL 500.3157(7) could not be applied to limit or change plaintiffs' rights to benefits under the insurance policies defendants had issued to them before the 2019 amendments. Ellen M. Andary and Phillip Krueger, who suffered traumatic injuries in automobile accidents before 2019, had been provided uncapped lifetime medical care covered by personal protection insurance (PIP) benefits under insurance policies and the no-fault act in effect at the time of their injuries. In 2019, the Legislature significantly overhauled the no-fault act pursuant to 2019 PA 21 and 2019 PA 22, resulting in large reductions in reimbursable family-provided attendant care hours and reimbursement rates for services that are not covered by Medicare for people who had suffered traumatic injuries because of automobile accidents. Plaintiffs argued that the 2019 amendments of MCL 500.3157 should not impact services and care that were already being provided and that had been reimbursable before the amendments. Specifically, plaintiffs alleged that the retroactive application of the 2019 amendments to them was improper and would also violate their constitutional rights under the Contracts Clause of Const 1963, art 1, § 10 and their due-process and equal-protection rights. Finally, plaintiffs all challenged the prospective application of the 2019 amendments on behalf of future motor vehicle accident victims and medical providers. Defendants moved to dismiss the case, and the trial court, Wanda M. Stokes, J., granted defendants' motion. Plaintiffs appealed, and the Court of Appeals, SHAPIRO and PATEL, JJ. (MARKEY, P.J., dissenting), affirmed in part, reversed in part, and remanded the case to the circuit court. ___ Mich App ___ (2022) (Docket No. 356487). Defendants sought leave to appeal in the Supreme Court, and the Supreme Court granted the application. 510 Mich 944 (2022).

In an opinion by Justice WELCH, joined by Chief Justice CLEMENT and Justices BERNSTEIN, CAVANAGH, and BOLDEN, the Supreme Court *held*:

The 2019 no-fault amendments of MCL 500.3157 that are at issue do not impact services and care that were already being provided to Andary and Krueger and that had been reimbursable prior to the amendments. Andary's and Krueger's rights to the PIP benefits at issue in this case were both contractual and statutory in nature, and the 2019 no-fault amendments did not retroactively modify their vested contractual rights. Plaintiffs' constitutional challenges to prospective application of the amended statutes were dismissed.

1. Prior to 2019, there was no statutory cap on the number of reimbursable hours of prescribed attendant care that could be provided to a covered individual by family members (as opposed to a commercial provider), nor were there limits on reimbursement rates for medical providers beyond a requirement that the cost for the service be reasonable and necessary. In 2019, the Legislature significantly amended MCL 500.3157; the amendments resulted in large reductions in family-provided attendant care hours and reimbursement rates for services that are not covered by Medicare for people who had suffered traumatic injuries because of automobile accidents. This case concerned whether these new limitations applied to individuals who were covered by a PIP policy and suffered injuries before the effective date of the 2019 no-fault amendments.

2. PIP benefits provided under a no-fault policy of insurance have both statutory and contractual characteristics. While neither Andary nor Krueger were named insureds on the insurance policies that provided them coverage, it was undisputed that they were covered individuals according to both the terms of the policies and the no-fault act, and thus they were entitled to benefits pursuant to the policies. Although the Court had previously declared that an injured employee's right to benefits and an employer's obligation to pay for an employee's medical expenses under the Worker's Disability Compensation Act (the WDCA), MCL 418.101 *et seq.,* are purely statutory in origin and cannot be "vested rights" for purposes of a constitutional Contracts Clause, Due Process Clause, or Takings Clause analysis, the no-fault act differs from the WDCA in that the WDCA is wholly a creature of statute that must be enforced through an administrative commission. Unlike the no-fault automobile insurance system, the WDCA expressly places on the *employer* a statutory obligation to provide or facilitate the provision of reasonable medical services to an employee who is injured in the course of employment. An employee's purely statutory right to workers' compensation benefits has nothing to do with whether an employer has purchased a private policy of insurance to cover the business's potential liability. Although the no-fault act mandates that certain minimum benefits be provided in private insurance policies, that does not mean that benefits available under a contractual policy of no-fault automobile insurance are purely statutory, as an injured employee's workers' compensation benefits are. Accordingly, PIP benefits under a no-fault insurance policy remain binding post-injury as to the individuals covered by the policy unless clearly and retroactively invalidated by the Legislature.

3. It has long been the rule in Michigan that for insurance purposes the rights and obligations of the parties vest at the time of the accident. For purposes of a no-fault policy of insurance, this means that neither the insured nor the insurer can unilaterally change the terms of a policy after a covered accident occurs. The scope of PIP benefits under an insurance policy vests at the time of injury. Andary's and Krueger's rights to PIP benefits under the applicable no-fault insurance policies vested, at the latest, when their injuries occurred and they first became eligible for PIP benefits. That was also when the insurers' legal obligation to pay PIP benefits for all reasonable and necessary medical expenses at the statutorily mandated minimum level, as

incorporated into the insurance contract, was triggered. While Andary and Krueger could not seek reimbursement for specific medical expenses until the expenses were actually incurred under MCL 500.3110(4), their rights under the insurance policies for reimbursement of all reasonable and necessary medical expenses at a particular (uncapped) level vested at the time of the automobile accidents causing their injuries—the events that triggered the coverage provided by the insurance policies.

4. In determining whether a law has retroactive effect, four principles are considered. First, a court considers whether there is specific language providing for retroactive application. Second, in some situations, a statute is not regarded as operating retroactively merely because it relates to an antecedent event. Third, retroactive laws impair vested rights acquired under existing laws or create new obligations or duties with respect to transactions or considerations already past. Finally, a remedial or procedural act not affecting vested rights may be given retroactive effect where the injury or claim is antecedent to the enactment of the statute. In this case, under the first factor, the amendments that 2019 PA 21 made to MCL 500.3157(7) and (10) appeared prospective on their face, but these provisions did not explicitly address *to* whom they apply. There was nothing in the clear language of MCL 500.3157, as amended by 2019 PA 21, that suggested an intent to modify the contractual rights of an injured individual who has uncapped PIP benefits and family-provided attendant care that vested prior to the enactment of the amendments. Under MCL 500.2111f(8), any savings from the class of individuals injured before July 1, 2021, who have no vested right to benefits at the pre-amendment level must be passed on in filings after July 1, 2020. However, MCL 500.2111f(8) does not reflect a clear expression of legislative intent that MCL 500.3157(7) and (10) apply retroactively to insureds who were injured while covered by an insurance policy providing them a contractual right to provider reimbursement at the pre-amendment levels. Under the second factor, MCL 500.3157(7) and (10) do not directly relate to antecedent events because, on their face, they apply to all services and care rendered after the listed effective dates. Accordingly, while application of the amended statutes to individuals like Andary and Krueger indirectly relates to antecedent car crashes and injuries, which triggered their rights to PIP benefits, this was not enough on its own to render the statute retroactive as to required benefits. But this consideration was not dispositive because the statutes are properly considered retroactive as applied to Andary and Krueger given that application would impair their vested contractual rights to PIP benefits at the pre-amendment level. Under the third factor, the application of MCL 500.3157(7) and (10) to Andary and Krueger would impair their vested contractual rights to PIP reimbursement for medical treatment at a particular level. When the insurance policies were issued and when Andary's and Krueger's injuries occurred, the policies provided no less than what the no-fault act required, and this guarantee was both contractual and statutory in nature. As a result, Andary and Krueger were entitled to enforce the rights that vested under the original contractual bargain absent clear legislative intent to retroactively modify that arrangement. Under the fourth factor, given that Andary's and Krueger's rights vested at the time of their injuries, this factor did not apply, even if the amendments were intended to remedy perceived problems with the previous system of no-fault automobile insurance. Accordingly, the insurance policies and the disputed portion of the no-fault statutes that existed when Andary and Krueger were injured controlled their entitlement to PIP benefits, not the amended provisions enacted by 2019 PA 21 and 2019 PA 22.

5. Plaintiffs lacked standing to maintain due-process and equal-protection challenges as to the prospective application of MCL 500.3157(7) or (10) on behalf of nonparties. Because due-

process and equal-protection rights are personal in nature, an individual generally cannot assert such rights on behalf of others. Andary's and Krueger's requests for relief were resolved with the determination that the 2019 amendments could not reduce the PIP benefits that they were entitled to receive; Andary and Krueger thereafter lacked a sufficiently concrete and direct interest to proceed with their constitutional challenges to the prospective application of the amended statutes. Eisenhower Center, a facility specializing in rehabilitative care for individuals with traumatic brain injuries, attempted to litigate constitutional claims on behalf of an abstract and undefined group of potential future patients who have yet to be injured or treated and potential medical providers with whom it has no affiliation; this was too abstract and tenuous a connection to establish standing as a representative of a nonparty for purposes of litigating constitutional claims. Finally, Eisenhower Center did not plead a challenge to MCL 500.3157(10) on its own behalf.

6. Eisenhower Center pointed to no fundamental right of its own that has been or will be infringed for purposes of its substantive due-process claim; accordingly, rational basis review applied to Eisenhower Center's prospective substantive due-process and equal-protection claims. Remand for discovery and further proceedings was unnecessary because no further factual development was necessary to conclude that the prospective application of the new fee schedule in MCL 500.3157(7) was reasonably and rationally related to a legitimate legislative purpose. Curbing escalating PIP benefits costs and lowering insurance premiums were legitimate governmental objectives, and the new fee schedules contained in MCL 500.3157(7) were reasonably and rationally related to accomplishing these objectives regardless of their effectiveness or wisdom.

Part II(A) of the Court of Appeals opinion affirmed; Part II(B) of the Court of Appeals opinion vacated; Part III of the Court of Appeals opinion affirmed in part and reversed in part; case remanded to the Ingham Circuit Court for further proceedings.

Justice VIVIANO, joined by Justice ZAHRA except for footnotes 2, 3, and 8, concurring in part and dissenting in part, would have held that the 2019 no-fault amendments broadly apply to all future medical expenses and attendant care services regardless of when the injury occurred. The provisions in MCL 500.3157 limiting medical-provider charges were very clear about what they apply to: treatment or training rendered within a specific period in the future. There was no textual indication that the Legislature meant to further limit these sections only to PIP benefits payable for accidents that occurred *after* enactment. MCL 500.3157(10) similarly offered nothing to suggest that it applies only to attendant care rendered for accidents occurring after the statute's effective date. MCL 500.2111f provided another strong textual indication that the reforms apply to pre-effective date policies. Under the current test for determining retroactivity, Justice VIVIANO would not find the reforms to be retroactive. The statute regulates activity that will occur post-enactment, and the fact that it relates to pre-reform accidents was not enough to make it retroactive. Moreover, PIP benefits for future treatment are not vested rights; an injured person covered by PIP has no immediate entitlement to PIP benefits for future treatment. At most, plaintiffs had a contingent right to benefits. Additionally, the reforms did not violate the Contracts Clause because they did not substantially impair any contractual obligations. The reforms did not prevent any covered person from legally enforcing defendants' obligation to pay reasonable expenses. Injured persons remained entitled to all reasonably necessary medical expenses and to the same level of attendant care services that they were prior to the reforms. Rather, the reforms limited what *medical care providers* can charge and *who* can provide the attendant care. Justice VIVIANO agreed

with the majority that Eisenhower Center lacked standing to bring challenges to the prospective application of the 2019 no-fault amendments on behalf of nonparty past and future patients and medical providers and that Eisenhower Center did not plead a challenge to MCL 500.3157(10) on its own behalf. He also agreed with the majority's conclusion that the Court of Appeals erred by remanding the case for discovery on Eisenhower Center's claim that prospective application of MCL 500.3157(7) violates its due-process and equal-protection rights.

Justice ZAHRA, dissenting, joined Justice VIVIANO's partial dissent in full except for footnotes 2, 3, and 8. He declined to address the validity of the retroactivity framework set forth in *LaFontaine Saline, Inc v Chrysler Group, LLC*, 496 Mich 26 (2014), given that both the majority and dissenting opinions applied *LaFontaine*'s framework to reach their respective conclusions.

# OPINION

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

FILED July 31, 2023

## STATE OF MICHIGAN

## SUPREME COURT

MICHAEL T. ANDARY, M.D., Conservator
and Guardian of ELLEN M. ANDARY, a
legally incapacitated person, RONALD
KRUEGER, Guardian of PHILIP
KRUEGER, a legally incapacitated person,
and MORIAH, INC., doing business as
EISENHOWER CENTER,

Plaintiffs-Appellees,

v

No. 164772

USAA CASUALTY INSURANCE
COMPANY and CITIZENS INSURANCE
COMPANY OF AMERICA,

Defendants-Appellants.

_____

BEFORE THE ENTIRE BENCH

WELCH, J.

Plaintiffs in these combined cases include two individuals who suffered traumatic

injuries in automobile accidents prior to 2019 and, as a result, have been provided uncapped

lifetime medical care covered by personal protection insurance (PIP) benefits under insurance policies and consistent with Michigan's no-fault act, MCL 500.3101 *et seq*. In 2019, in an effort to control the cost of automobile insurance, the Legislature significantly overhauled the no-fault act. Several amendments resulted in large reductions in family-provided attendant care hours and reimbursement rates for services that are not covered by Medicare for people who had suffered traumatic injuries because of automobile accidents. Plaintiffs argue that the 2019 amendments of MCL 500.3157 should not impact services and care that were already being provided to them and that had been reimbursable prior to the amendments. We agree and affirm the Court of Appeals' judgment in this regard. The insurance policies covering plaintiffs Ellen Andary and Phillip Krueger bind the insurance companies to their promise to provide PIP benefits under the law that existed at the time of injury to those individuals covered by the policies, and the 2019 no-fault amendments do not clearly convey an intent to retroactively modify these vested contractual rights. Andary and Krueger are covered by policies under which premiums were paid with the expectation that uncapped lifetime benefits would be provided for all reasonable and necessary medical expenses. Their vested contractual right to continuation of those benefits at pre-amendment levels cannot be stripped away or diminished when the Legislature has failed to clearly state its intent to do so.

As to Andary's and Krueger's due process and equal protection challenges to prospective application of the 2019 no-fault amendments, we agree with the Court of Appeals that there is no further relief that can be provided to these plaintiffs and thus that they lack standing to move forward with their prospective claims. Plaintiffs also lack standing to maintain the alleged due process and equal protection challenges to MCL

2

500.3157(7) and (10) on behalf of nonparty future patients and other medical providers. Eisenhower Center does not have the same standing problems as to the due process and equal protection claims concerning the prospective application of MCL 500.3157(7) brought on its own behalf. However, we reverse the Court of Appeals' decision to revive Eisenhower's due process and equal protection challenges and to remand for discovery. Contrary to the conclusion reached by the Court of Appeals, discovery is not necessary to resolve these claims under rational basis review. Curbing escalating PIP benefits costs and lowering insurance premiums are legitimate governmental objectives, and the new fee schedules contained in MCL 500.3157(7) are reasonably and rationally related to accomplishing these objectives regardless of their effectiveness or wisdom. Accordingly, we reinstate the circuit court's dismissal of plaintiffs' constitutional challenges to prospective application of the amended statutes, albeit for slightly different reasons.

## I. ORIGINS OF NO-FAULT AUTOMOBILE INSURANCE IN MICHIGAN AND THE GOVERNING STATUTES

More than 50 years ago, Michigan's no-fault act, 1972 PA 294, was enacted by the Legislature as "an innovative social and legal response to the long payment delays, inequitable payment structure, and high legal costs inherent in the tort (or 'fault') liability system." *Shavers v Attorney General*, 402 Mich 554, 578; 267 NW2d 72 (1978). The Legislature believed that its goal of providing victims of motor vehicle accidents with "assured, adequate, and prompt reparation for certain economic losses" could be best achieved through a "system of compulsory insurance." *Id*. at 578-579. This system required every resident motorist to purchase a no-fault insurance policy from a private

insurer and provided that the "victims of motor vehicle accidents would receive insurance benefits for their injuries as a substitute for their common-law remedy in tort." *Id*. at 579.

This Court confirmed that such action was constitutionally within the Legislature's police power while also recognizing constitutional deficiencies that had to be addressed to protect the welfare of Michigan motorists and ensure their access to insurance at "fair and equitable rates." *Id*. at 580. This Court's decision left the statutory scheme in place for 18 months to allow the Legislature to cure these constitutional deficiencies, and the Legislature amended the no-fault act during that time frame. After no further claims were raised attacking the amended scheme as unconstitutional, this Court upheld the then-novel system of automobile insurance. *Shavers v Attorney General*, 412 Mich 1105 (1982).[1]

Unsurprisingly, Michigan's no-fault automobile insurance system has been the subject of continual debate, praise, criticism, amendment, and litigation since its creation and this Court's decision in *Shavers*. Despite these challenges, for nearly 50 years, statutory law has mandated that PIP benefits under automobile insurance policies provide, at minimum, for payment of "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care recovery, or rehabilitation," subject to exceptions in MCL 500.3107(2). MCL 500.3107(1)(a), as amended by 2012 PA 542.

When a covered person is injured and requires medical treatment, they or their lawful medical provider are entitled to charge and be reimbursed for "a reasonable amount

---

[1] The Court left open the possibility of "future attacks on the constitutionality of the act based upon the concerns expressed in our opinion." *Shavers*, 412 Mich at 1105. However, no such challenges were ever presented to or addressed by this Court.

for the products, services and accommodations rendered," so long as charges do "not exceed the amount the person or institution customarily charges for like products, services and accommodations in cases not involving insurance." MCL 500.3157, as enacted by 1972 PA 294. Prior to 2019, there was no statutory cap on the number of reimbursable hours of prescribed attendant care that could be provided to a covered individual by family members (as opposed to a commercial provider), nor were there limits on reimbursement rates for medical providers beyond a requirement that the cost for the service be reasonable and necessary. While Michigan's system of no-fault insurance has succeeded in ensuring lifetime benefits for those who suffer catastrophic injuries in an automobile accident, the issue of cost has been subject to ongoing debates for decades. It is no surprise that the Legislature has often tried to make improvements, and recent efforts in that vein are precisely why the parties are before the Court today.

In 2019, the Michigan Legislature made sweeping changes to Michigan's no-fault statutes when it enacted 2019 PA 21 and 2019 PA 22. The amendments that are directly at issue in this matter are primarily contained in MCL 500.3157. The relevant portions of the amended statute state the following:

> (1) Subject to subsections (2) to (14), a physician, hospital, clinic, or other person that lawfully renders treatment to an injured person for an accidental bodily injury covered by personal protection insurance, or a person that provides rehabilitative occupational training following the injury, *may charge a reasonable amount for the treatment or training. The charge must not exceed the amount the person customarily charges for like treatment or training in cases that do not involve insurance.*

> (2) Subject to subsections (3) to (14), a physician, hospital, clinic, or other person that renders treatment or rehabilitative occupational training to an injured person for an accidental bodily injury covered by personal

5

protection insurance *is not eligible for payment or reimbursement under this chapter for more than the following*:

(a) For treatment or training rendered after July 1, 2021 and before July 2, 2022, 200% of the amount payable to the person for the treatment or training under Medicare. [Decreasing the amount payable to 190% by July 2023.]

\* \* \*

(7) *If Medicare does not provide an amount payable for a treatment or rehabilitative occupational training under subsection (2)*, (3), (5), or (6), the physician, hospital, clinic, or other person that renders the treatment or training *is not eligible for payment or reimbursement under this chapter of more than the following, as applicable*:

(a) For a person to which subsection (2) applies, the applicable following percentage of the amount payable for the treatment or training under the person's charge description master in effect on January 1, 2019 or, if the person did not have a charge description master on that date, the applicable following percentage of the average amount the person charged for the treatment on January 1, 2019:

(*i*) For treatment or training rendered after July 1, 2021 and before July 2, 2022, 55%. [Decreasing the amount payable to 52.5% by July 2023.]

\* \* \*

(10) *For attendant care rendered in the injured person's home, an insurer is only required to pay benefits for attendant care up to the hourly limitation [56 hours per week] in section 315 of the worker's disability compensation act of 1969, 1969 PA 317, MCL 418.315.*[2] *This subsection only applies if the attendant care is provided directly, or indirectly through another person, by any of the following*: [family members, household members, and preexisting social or business relations.][3]

---

[2] MCL 418.315(1) provides that "[a]ttendant or nursing care shall not be ordered in excess of 56 hours per week if the care is to be provided by the employee's spouse, brother, sister, child, parent, or any combination of these persons."

[3] While the limits set forth in MCL 500.3157(10) apply to family members, household members, and individuals with preexisting social or business relations with the insured, for

(11) An insurer may contract to pay benefits for attendant care for more than the hourly limitation under subsection (10). [MCL 500.3157, as amended by 2019 PA 21 (emphasis added).]

Insurance policies providing for less than uncapped PIP benefits were not available until July 2, 2020, and the new fee schedules did not become effective until July 2, 2021. In summary, the challenged 2019 amendments (1) dramatically reduce reimbursement rates for services rendered to automobile accident victims and (2) limit the ability of family members and friends to be compensated for providing round-the-clock care to those who have suffered catastrophic injuries in an automobile accident. Family-provided services needed beyond 56 hours will not be reimbursed by a no-fault insurer without a new contractual agreement entered into after the effective date of the amendments. For practical purposes, this will often mean that necessary medical care can only be provided by a third-party agency or that accident victims who require 24-hour care must be moved into nursing homes or similar facilities because family members can no longer be compensated for providing care beyond the 56-hour cap.

Additionally, the 2019 no-fault amendments created a new provision in the Insurance Code—MCL 500.2111f, as enacted by 2019 PA 21 and 2019 PA 22—which provides, in relevant part, as follows:

(1) Before July 1, 2020, an insurer that offers automobile insurance in this state shall file premium rates for personal protection insurance coverage for automobile insurance policies effective after July 1, 2020.

* * *

simplicity, throughout this opinion, we refer to the group collectively as "family" or "family members" when discussing the attendant care limitation.

7

(8) *An insurer shall pass on, in filings to which this section applies, savings realized from the application of [MCL 500.3157(2) to (12)] to treatment, products, services, accommodations, or training rendered to individuals who suffered accidental bodily injury from motor vehicle accidents that occurred before July 2, 2021.* An insurer shall provide the director with all documents and information requested by the director that the director determines are necessary to allow the director to evaluate the insurer's compliance with this subsection. After July 1, 2022, the director shall review all rate filings to which this section applies for compliance with this subsection. [Emphasis added.]

The current dispute primarily concerns the new fee schedules and the attendant care limitations contained in MCL 500.3157(7) and (10). Specifically, we must address whether these new limitations apply to individuals who were covered by a PIP policy and suffered injuries prior to the effective date of the 2019 no-fault amendments. Plaintiffs also argue that these amended statutory provisions are unconstitutional even when applied prospectively to newly injured individuals and their caretakers or medical providers.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In December 2014, plaintiff Ellen Andary was a passenger in a vehicle that was struck by a drunk driver. Andary suffered severe injuries, including a brain injury that rendered her permanently disabled. Andary was a "covered person" under a no-fault insurance policy that was purchased by her husband, Dr. Michael Andary, from defendant USAA Casualty Insurance Company (USAA). The insurance policy provided for PIP benefits, which reimbursed "all reasonable fees for **reasonably necessary products and services** and accommodations for a **covered person's** care, recovery, or rehabilitation" and further stated that "[t]here is no maximum dollar amount for reasonable and necessary

8

**medical expenses** incurred for a **covered person's** care, recovery, or rehabilitation."[4] Andary has been prescribed in-home attendant care services at 36 hours per day (as she needs multiple caregivers), and these services have historically been provided by family members. Prior to the 2019 no-fault amendments, Andary incurred reasonable medical expenses that were reimbursed by USAA pursuant to the policy purchased by her husband.

In March 1990, plaintiff Philip Krueger was a passenger in a pickup truck when it crashed. Krueger suffered severe catastrophic injuries, including a severe traumatic brain injury that has left him permanently disabled. Krueger was covered by a no-fault insurance policy purchased by his father, Ronald Krueger, from defendant Citizens Insurance Company of America (Citizens). Plaintiffs' complaint alleges that Krueger's policy required that PIP benefits be paid for "allowable expenses" consisting of "all 'reasonable charges incurred for reasonably necessary products, services, and accommodations for an injured person's care, recovery, or rehabilitation,' " which is what was required by MCL 500.3107(1)(a) as it existed at the time the policy was issued.[5] (Emphasis omitted.) Krueger became a resident of plaintiff Eisenhower Center in November 1997, where he has resided since. Prior to the 2019 no-fault amendments, Krueger would incur reasonable medical expenses for the services provided by the Eisenhower Center, which would be reimbursed by Citizens pursuant to the policy purchased by his father.

_____

[4] Andary's policy does not cite MCL 500.3107(1)(a), but the parties do not dispute that the policy provided for at least the minimum PIP benefits that were required by the no-fault act when the policy was issued.

[5] The parties have not provided the Court with a copy of the insurance policy covering Krueger, but they do not dispute that it provided at least the minimum PIP benefits required by the no-fault act when the policy was issued.

Plaintiff Eisenhower Center is a facility in Ann Arbor specializing in rehabilitative care for individuals who have suffered traumatic brain injuries. The majority of Eisenhower Center's residents have disabilities, in particular brain injuries, resulting from car crashes. When this lawsuit was filed, over 80% of the center's 156 residents were motor vehicle accident victims covered by no-fault policies and the no-fault act.[6]

## A. PROCEEDINGS IN CIRCUIT COURT

On October 3, 2019, before the effective date of the challenged provisions of the 2019 no-fault amendments, plaintiffs filed an 18-count complaint against USAA and Citizens. Plaintiffs sought a declaratory judgment that the new limitations on in-home family-provided attendant care in MCL 500.3157(10) and the non-Medicare fee schedule of MCL 500.3157(7) cannot be applied to limit or change their rights to benefits under the insurance policies issued by defendants that vested at the time of injury.[7]

---

[6] Amicus briefs filed by the Michigan Osteopathic Association, the Brain Injury Association of Michigan, and a group of individuals who suffered catastrophic injuries in automobile crashes before 2019 have provided additional information concerning the confusion and consequences allegedly caused by disputes about the applicability of the no-fault amendments at issue in this case. Amici contend that patients have died or experienced serious health declines after implementation of the 2019 no-fault amendments forced drastic changes to their treatment, that traumatic accident survivors frequently require more than 56 hours of care per week, that such care is often provided by family members, and that healthcare providers who have historically served catastrophically injured automobile accident victims are understaffed and closing in large numbers.

[7] Specifically, all plaintiffs allege that (1) retroactive application of the 2019 amendments to them is improper and would violate their constitutional rights under the Contracts Clause of Const 1963, art 1, § 10, and (2) the fee schedule would violate their equal protection rights because the schedule unreasonably reduced reimbursement for non-Medicare compensable services in comparison to services that are covered by Medicare. Andary and Krueger allege that the 2019 amendments would deprive them of their due process rights to privacy in violation of Const 1963, art 1, § 17 by limiting their access to care and their ability to choose medical providers. Andary argues that application of the 2019

In lieu of answering the complaint, defendants moved to dismiss under MCR 2.116(C)(8), arguing that the 2019 no-fault amendments were constitutional, that the alleged privacy and property interests were not fundamental rights for due process or equal protection purposes, that the alleged Contracts Clause violations were invalid because PIP benefits are governed by the no-fault act rather than by contract, and that plaintiffs lacked standing to assert the constitutional rights of others.

The circuit court's ruling on defendants' motion bundled plaintiffs'18 counts into three groups: Contracts Clause claims, substantive due process claims, and equal protection claims. The court rejected each argument. First, as to the Contracts Clause claims, the circuit court stated that PIP benefits are mandated by the no-fault act and that a claimant's entitlement to PIP benefits is based in statute, not in contract. The court held that the 2019 no-fault amendments did not impair contractual rights, the amendments had a valid constitutional purpose, and the amendments reasonably accomplished that purpose.

Second, as to the due process claims, the circuit court held that there was no fundamental right to have medical providers or family caregivers compensated at a certain rate for attendant care, that the fundamental rights to privacy or to bodily integrity were not at issue under the facts alleged, and that the lack of a fundamental right meant that the amendments merely needed to meet a rational basis standard of review, which they did.

---

amendments would violate her equal protection rights by unreasonably treating individuals who receive family-provided in-home attendant care differently than those receiving the same care from a commercial entity. Eisenhower alleges that its due process right to property would be violated by the new non-Medicare fee schedule, which will force it out of business. Finally, plaintiffs all challenge the prospective application of the 2019 amendments on behalf of future motor vehicle accident victims and medical providers.

11

Third, as to the equal protection claims, the court, using a rational basis analysis, rejected the notion that it violated plaintiffs' constitutional rights for the fee schedules in the amendments to create and treat differently two classes of automobile accident victims and medical providers—those requiring/performing services or treatment compensable by Medicare and those receiving/performing services or treatment not compensable by Medicare.

Fourth, the circuit court held that plaintiffs could not seek relief on behalf of past, present, and future motor vehicle accident victims and their medical providers because constitutional rights are personal, and a person generally cannot assert the constitutional rights of others.[8]

## B. APPELLATE PROCEEDINGS

Plaintiffs appealed in the Court of Appeals, challenging each of the circuit court's rulings.[9] In a split, published decision, the Court of Appeals affirmed in part, reversed in part, and remanded the case to the circuit court for further proceedings. *Andary v USAA Cas Ins Co*, ___ Mich App ___; ___ NW2d ___ (2022) (Docket No. 356487).

The Court of Appeals majority first held that the amendments of MCL 500.3157(7) and (10), the challenged provisions that established caps on reimbursement rates and reduced family-provided home caregiver hours, do not apply retroactively to individuals

---

[8] Plaintiffs also moved for reconsideration and sought leave to amend their complaint to allege a breach of contract claim, but the court denied their request.

[9] Plaintiffs also filed a bypass application seeking this Court's attention before the Court of Appeals resolved their appeal. This Court denied that request. *Andary v USAA Cas Ins Co*, 507 Mich 941 (2021).

who were injured and whose right to no-fault benefits vested before the effective date of the amendments. *Id*. at ___; slip op at 11. The majority held that MCL 500.2111f(8)—a provision that directs insurers to pass on applicable savings to the purchasers of new insurance policies—was not a clear statement of legislative intent for the amended MCL 500.3157 to apply to individuals injured and covered by a no-fault insurance policy before the effective date of the 2019 amendments. *Id*. at ___; slip op at 4. Rather, MCL 500.2111f(8) merely provided that if there are savings realized because of the new premium limits, those savings must be used to reduce future rates. *Id*. at ___; slip op at 4-5.

The majority also rejected defendants' argument that the statutes were not, in fact, being retroactively applied because they merely apply to services rendered after the effective date. The majority concluded that defendants' reasoning ran afoul of *LaFontaine Saline, Inc v Chrysler Group, LLC*, 496 Mich 26; 852 NW2d 78 (2014), which held that an automobile dealership could not invoke recent amendments to a statute concerning encroachment by competitors because this would retroactively modify its prior agreement with the defendant manufacturer. According to the majority, the parties " 'did not bargain for or contemplate' " that "limits would be placed on the amount of attendant care family members can provide an injured person" or that reimbursement for treatment not compensable by Medicare would be limited to 55% of what is customarily charged by providers. *Andary*, ___Mich App at ___; slip op at 7-8, quoting *LaFontaine*, 496 Mich at 41.

Thus, application of the 2019 no-fault amendments would upset expectations that had been in place for nearly 50 years. *Andary*, ___Mich App at___; slip op at 8. The

majority also rejected the characterization of PIP benefits as purely statutory in nature, noting that while "[t]he no-fault act sets the mandatory minimum coverage for PIP policies and is the 'rule book' for disputes over that coverage," the insurance policies are still a contract, insurers are entitled to traditional contract defenses that have not been abrogated by the no-fault act, and the policies create enforceable contract rights. *Id*. at ___; slip op at 9 (citation omitted).

The majority next rejected defendants' argument that individuals injured before the 2019 amendments could not have reasonably relied on the benefits provided by the insurance policies and the no-fault act as it existed at the time of the accident because they had no vested right in the continuation of the no-fault act as it existed on the date of their accidents. In doing so, the majority distinguished two decisions concerning amendments of Michigan's Worker's Disability Compensation Act (the WDCA), MCL 418.101 *et seq.*—*Lahti v Fosterling*, 357 Mich 578; 99 NW2d 490 (1959), and *Romein v Gen Motors Co*, 436 Mich 515; 462 NW2d 555 (1990). Unlike the workers' compensation system, the majority held that the no-fault automobile insurance scheme is not "wholly a creature of statute and regulation." *Andary*, ___ Mich App at ___; slip op at 9.

Turning to the Contracts Clause, as an alternative line of reasoning, the majority held that even if the Legislature clearly intended 2019 PA 21 to apply retroactively to individuals who already were injured and receiving PIP benefits before the amendments' effective date, "retroactive application violates the Contracts Clause of the Michigan Constitution." *Id*. at ___; slip op at 11. The majority reasoned that the amendments substantially and severely impaired Andary's and Krueger's rights under the no-fault policies that they were issued prior to the amendments, that defendants had not adequately

14

explained what significant and legitimate public purpose justified such an impairment, and that stripping previously injured individuals of their existing right to uncapped benefits was not reasonably related to the goal of lowering future insurance rates and premiums.[10]

As to the remaining due process and equal protection claims concerning prospective application of the statutes, the majority first noted that its ruling on retroactivity effectively granted Krueger and Andary full relief. Therefore, Krueger and Andary no longer had the requisite personal interest in the issue of prospective application for purposes of standing. *Andary*, ___ Mich App at ___; slip op at 13. Relying on *Shavers*, 402 Mich at 615, the majority held that Eisenhower Center's claims could not be resolved at this early stage of the proceedings, even under a rational basis standard of review, given the alleged lack of an adequate record. A remand for discovery as to Eisenhower Center's claim was thus deemed necessary. *Andary*, ___ Mich App at ___; slip op at 14-15.

The dissenting opinion in the Court of Appeals stated that the challenged amendments of the no-fault act were not being applied retroactively because they only applied to care or services provided after the effective date and a claim for payment of PIP benefits does not accrue until the expense is incurred. *Andary*, ___ Mich App at ___ (MARKEY, P.J., dissenting); slip op at 5. Even if the amended no-fault act were being applied retroactively, the dissent stated that reading MCL 500.2111f(8) in conjunction with MCL 500.3157 demonstrated clear legislative intent for retrospective application to plaintiffs like Andary and Krueger. *Id*. at ___; slip op at 6. The dissent further stated that

---

[10] As discussed later, we need not address the majority's holding on this point because we vacate this part of the opinion.

15

the majority's Contracts Clause analysis was flawed because Andary and Krueger were not parties to the insurance contracts, PIP benefits were purely statutory in nature and thus could not give rise to a vested right, and the amendments survived a rational basis standard of review. *Id*. at ___; slip op at 7-10. The dissent would have additionally affirmed the dismissal of the equal protection and due process challenges. *Id*. at ___; slip op at 11.

Defendants sought leave to appeal in the Supreme Court. We granted defendants' application and directed the parties to brief

> whether the Court of Appeals erred when it: (1) held that claimants injured before the effective date of 2019 PA 21 are not subject to the limitations on benefits set forth in MCL 500.3157(7) and (10); (2) held that application of the amended statute to such claimants would violate the Contracts Clause of the Michigan Constitution, Const 1963, art 1, § 10; and (3) remanded the case to the circuit court for discovery to determine whether the no-fault amendments, even when applied only prospectively, pass constitutional muster. [*Andary v USAA Cas Ins Co*, 510 Mich 944, 945 (2022).]

### III. STANDARD OF REVIEW

We review de novo a trial court's decision to grant or deny summary disposition. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). A motion seeking summary disposition under MCR 2.116(C)(8) tests the legal sufficiency of a claim, with all well-pleaded factual allegations in the complaint being accepted as true. *Id*. at 159-160; MCR 2.116(G)(5). Such a motion may be granted only "when a claim is so clearly unenforceable that no factual development could possibly justify recovery." *El-Khalil*, 504 Mich at 160.

### IV. APPLICATION OF 2019 NO-FAULT ACT AMENDMENTS TO PRIOR INJURIES

To determine whether the 2019 amendments of MCL 500.3175 of the no-fault act apply to Andary and Krueger, we must determine whether application of the amendments

16

to them would be an issue of retroactive application of the law. If Andary and Krueger possess vested rights to PIP benefits at pre-amendment levels and applying these amendments would impair those rights, then application of the changes would be retroactive. We will not read a statute as permitting retroactive impairment of vested rights "unless the Legislature clearly manifest[ed] the intent for retroactive application." *Buhl v City of Oak Park*, 507 Mich 236, 244; 968 NW2d 348 (2021) (quotation marks and citation omitted). Thus, as we did in *LaFontaine*, we must determine the source of the parties' rights that are alleged to predate and be affected by the 2019 no-fault amendments.[11]

## A. THE RIGHTS TO THE PIP BENEFITS AT ISSUE ARE BOTH CONTRACTUAL AND STATUTORY IN NATURE

PIP benefits provided under a no-fault policy of insurance have both statutory and contractual characteristics. While neither Andary nor Krueger were named insureds on the insurance policies that provide them coverage, it is undisputed that they were covered individuals according to both the terms of the policies and the no-fault act, and thus they are entitled to benefits pursuant to the policies. The insurance policy purchased by Andary's husband to cover his family provided for payment of "all reasonable fees for **reasonably necessary products and services** and accommodations for a **covered person's** care, recovery, or rehabilitation" and further stated that "[t]here is no maximum dollar amount for reasonable and necessary **medical expenses** incurred for a **covered**

---

[11] While the dissent asserts that it is "telling" that we begin with the nature and source of the legal rights that have allegedly been infringed by the 2019 no-fault amendments, this is precisely the approach required by our seminal decision in *LaFontaine*. Such an approach is appropriate for two reasons: (1) we must first determine whether a right has vested before we can determine whether application of a statute would retroactively impair that right, and (2) this Court has long employed a presumption against retroactivity.

17

**person's** care, recovery, or rehabilitation." The Andary policy does not specifically refer to MCL 500.3107 of the no-fault act, but it clearly paraphrases the language of the statute as it existed at the time the policy was issued.[12] The Court has not been provided with a copy of the policy covering Krueger, but no one has disputed that the policy Citizens issued provided at least the minimum PIP coverage required by the no-fault act before the 2019 amendments.

Andary's and Krueger's rights to PIP benefits were both contractual and statutory in nature. We reject the arguments put forward by defendants and the Court of Appeals dissent that PIP benefits are wholly statutory. It is initially worth observing that there was a market in Michigan for *voluntary* private automobile insurance long before the first iteration of Michigan's no-fault act and its mandate to carry insurance coverage as a condition of operating a vehicle. As a result, courts had to resolve legal disputes about that coverage before the no-fault act. See, e.g., *Auto Owners Ins Co v Zeller*, 370 Mich 496; 122 NW2d 728 (1963); *Fleckenstein v Citizens' Mut Auto Ins Co*, 326 Mich 591; 40 NW2d 733 (1950); *Central Wholesale Co v Wolverine Ins Co*, 4 Mich App 688; 145 NW2d 375 (1966). With the enactment of 1972 PA 294, the Michigan Legislature changed the landscape by mandating that people operating motor vehicles in Michigan purchase a policy of insurance from a private vendor and mandating a floor for certain forms of coverage and benefits, including PIP benefits. We further disagree with defendants'

---

[12] See MCL 500.3107(1)(a), as amended by 2012 PA 542 (stating that PIP benefits are payable for "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation").

argument that the no-fault automobile insurance system is similar to the workers' compensation system, see *Romein*, 436 Mich at 532, such that the presumption against retroactivity does not apply to amendments affecting PIP benefits provided under preexisting insurance policies and statutes. The history and formation of the two systems differs dramatically and in a meaningful way such that defendants' arguments are unpersuasive.

1. DISTINCTIONS BETWEEN THE NO-FAULT ACT AND THE WDCA

In Michigan and throughout the country, the ability of an employee injured on the job to receive compensation for medical expenses and resulting disabilities was originally one of pure tort liability in private civil suits until states and the federal government crafted legislation that later evolved into our current workers' disability compensation scheme. See, e.g., McCluskey, *The Illusion of Efficiency in Workers' Compensation "Reform"*, 50 Rutgers L Rev 657, 670-671 (1998) (explaining the history and origin of workers' compensation); Aldrich, *History of Workplace Safety in the United States, 1880-1970* <https://eh.net/encyclopedia/history-of-workplace-safety-in-the-united-states-1880-1970-2/> (accessed May 23, 2023) [https://perma.cc/WA4P-4UEC]. Michigan's workers' compensation law was first adopted in 1912 and was later consolidated into the WDCA in 1969. See 1969 PA 317.

The workers' compensation system was wholly a creature of statute fashioned by the Legislature that must be enforced through an administrative commission. *Lahti*, 357 Mich at 585. The express intent of Michigan's original workers' compensation law was to

> give employers protection against common-law actions and to place upon industry, where it properly belongs, not only the expense of the hospital and

19

medical bills of the injured employee, but place upon it the burden of making a reasonable contribution to the sustenance of that employee and his dependents during the period of time he is incapacitated from work. [*Id*.]

The law almost entirely eliminated the ability of both employees and employers to rely on " 'common-law actions to secure adjudication of rights and liabilities arising from industrial accidents' " and limited both to only those rights, liabilities, and remedies provided by the statutory scheme. *Id*., quoting *Munson v Christie*, 270 Mich 94, 98; 258 NW 415 (1935). Over many years, as industry further developed and work conditions changed, the Legislature amended the laws "requiring industry to assume its share of the new responsibilities." *Lahti*, 357 Mich at 586-587.

Unlike the no-fault automobile insurance system, the WDCA expressly places on the *employer* a statutory obligation to provide or facilitate the provision of reasonable medical services to an employee who is injured in the course of employment. MCL 418.315(1).[13] The same was true for versions of Michigan's workers' compensation laws that preceded the WDCA.[14] An employee's purely statutory right to workers' compensation benefits has nothing to do with whether an employer has purchased a private

---

[13] Specifically, MCL 418.315(1) states that subject to statutory exceptions, "[t]he employer shall furnish, or cause to be furnished, to an employee who receives a personal injury arising out of and in the course of employment, reasonable medical, surgical, and hospital services and medicines, or other attendance or treatment recognized by the laws of this state as legal, when they are needed."

[14] Specifically, the statute that was at issue in *Lahti*, 1954 CL 412.4, provided that "[t]he employer shall furnish, or cause to be furnished, reasonable medical, surgical, and hospital services and medicines when they are needed [for a specific period of time]. . . . If the employer shall fail, neglect or refuse so to do such employee shall be reimbursed for the reasonable expense incurred by or on his behalf in providing the same, by an award of the commission."

policy of insurance to cover the business's potential liability. Rather, if the individual is an employee at a covered business, they are generally entitled to workers' compensation coverage if injured on the job as a matter of statutory law, regardless of whether the employer was complying with the WDCA. See, e.g., MCL 418.301; MCL 418.641; MCL 418.647. Whether an employer has purchased workers' compensation insurance to comply with the WDCA does not affect an employer's statutory obligation to provide medical services.

*Lahti* recognized that there can "be no vested right in an existing law which precludes its change or repeal" and that "[t]he legislature had the authority to revoke [an employee's common-law] remedy and, therefore, certainly had the authority to restore it when it saw fit to do so." *Lahti*, 357 Mich at 589 (quotation marks and citation omitted). Thus, we have previously declared that an injured employee's right to benefits and an employer's obligation to pay for an employee's medical expenses under the WDCA are purely statutory in origin and cannot be "vested rights" for purposes of a constitutional Contracts Clause, Due Process Clause, or Takings Clause analysis.[15]  See *Romein*, 436 Mich at 525, 532-533, 536; *Lahti*, 357 Mich at 588-589, 595-596.

_____

[15] The dissent appears to question the validity of our holding in *Lahti* that WDCA rights are purely statutory. The dissent notes that some of the cases from other jurisdictions discussed in *Lahti* suggest that the employer's liability under the workers' compensation scheme in those states was contractual in nature. But the law in Michigan is clear. Under the WDCA, an employer's obligation to pay for an injured employee's benefits is statutory in nature, regardless of whether the employer contracts with an insurer to underwrite its potential liability. The only contract potentially at issue in *Lahti* was between the employer and the insurer. There is no mention at all in the case of a contract between the employee and employer, much less a contract that was affected by the Court's decisions. We held that the Legislature had the authority to retroactively change (1) the scope of *purely statutory benefits and remedies* to which an employee was entitled and (2) the *statutory*

21

Although the no-fault act mandates that certain minimum benefits be provided in private insurance policies, that does not mean that benefits available under a contractual policy of no-fault automobile insurance are purely statutory, as an injured employee's workers' compensation benefits are. Defendants rely heavily on *Rohlman v Hawkeye-Security Ins Co*, 442 Mich 520, 525; 502 NW2d 310 (1993), for the proposition that when the minimum benefits mandated by the no-fault act are at issue, "the statute is the 'rule book' for deciding the issues involved in questions regarding awarding those benefits." This is true, but the statement was made in reference to resolving conflicts between language in the insurance policy at issue and the no-fault act, and *Rohlman* merely acknowledged that an insurance policy must provide at least the minimum PIP benefits required by the no-fault act. We then held that "the insurance policy itself, which is the contract between the insurer and the insured, controls the interpretation of its own provisions providing benefits not required by statute." *Id*. The insurance coverage question in *Rohlman* was then decided on the basis of the contract language because the coverage at issue was not mandated by the no-fault act. *Rohlman* did not address—nor did it endorse—the idea that the scope of PIP benefits to which one is entitled post-injury under

---

*obligations of an* employer to pay for medical expenses. We also held that the WDCA amendments did not offend the Constitution because the Legislature's intent was sufficiently clear that some of the changes be retrospective in operation. See *Lahti*, 357 Mich at 589, 595.

Then in *Romein*, the Court examined whether subsequent WDCA amendments were retroactive changes that offended the Due Process Clause or Contracts Clause of the United States Constitution. With this context in mind, there is nothing confusing about the subsequent statement in *Romein* that "workers' compensation benefits and liabilities are statutory in origin and may be revoked or modified at the will of the Legislature." *Romein*, 436 Mich at 532.

22

an insurance policy will change each time the no-fault act is amended. It is undisputed that the insurance policies covering Andary and Krueger provided for at least the minimum PIP benefits that were mandated by the no-fault act at the time the policies were issued. This does not transform contractual PIP benefits rights into purely statutory rights.

As the Court of Appeals in this case recognized, despite the relevance of the no-fault act, lawsuits against insurers seeking to enforce PIP benefits have long been litigated as contract actions. "[I]nsurers can avail themselves of both statutory defenses and common-law defenses that the no-fault act has not displaced" in addition to contractual fraud defenses so long as a defense has "not been abrogated" by the no-fault act. *Meemic Ins Co v Fortson*, 506 Mich 287, 300-303; 954 NW2d 115 (2020).

Additionally, unlike the system created by the WDCA, the no-fault act did not mandate that all claims to enforce PIP rights be brought in a specialized administrative tribunal subject to its own rules and regulations. A person injured in an automobile accident can bring a direct, private cause of action against an insurer to enforce the terms of an applicable no-fault policy of insurance so long as the terms do not provide for *less* than what the statutory scheme mandates.

We conclude that PIP benefits mandated by the no-fault act are both statutory and contractual in nature in cases in which the injured person is provided PIP benefits as a covered individual under the terms of a no-fault insurance policy. Accordingly, the PIP benefits under a no-fault insurance policy remain binding post-injury as to the individuals covered by the policy unless clearly and retroactively invalidated by the Legislature.

23

## 2. THE SCOPE OF PIP BENEFITS UNDER AN INSURANCE POLICY VESTS AT THE TIME OF INJURY

We must next analyze whether, as plaintiffs argue, the scope of PIP benefits under a no-fault policy of insurance and the governing law vests at the time of injury. Defendants alternatively argue that the scope of PIP benefits does not vest at the time of injury because a claim for a specific amount of PIP benefits does not accrue until medical care is provided. Although defendants are correct about the accrual of a specific claim for payment of PIP benefits, the scope of available PIP benefits under an insurance policy vests at the time of injury.

It has long been the rule in Michigan that for insurance purposes "[t]he rights and obligations of the parties vest[] at the time of the accident." *Clevenger v Allstate Ins Co*, 443 Mich 646, 656; 505 NW2d 553 (1993), citing *Cason v Auto Owners Ins Co*, 181 Mich App 600, 609; 450 NW2d 6 (1989); *Madar v League Gen Ins Co*, 152 Mich App 734, 742; 394 NW2d 90 (1986); see also *Detroit Auto Inter-Ins Exch v Ayvazian*, 62 Mich App 94; 233 NW2d 200 (1975). For purposes of a no-fault policy of insurance, this clear statement of law means that neither the insured nor the insurer can unilaterally change the terms of a policy after a covered accident occurs.[16] This rule is based on a longstanding principle of insurance law that the " 'liability of the insurer with respect to insurance . . . becomes

---

[16] This Court has recognized limited circumstances where, as an equitable remedy but not an absolute right, an insurer may be permitted to rescind a no-fault insurance policy after an accident occurs, *Bazzi v Sentinel Ins Co*, 502 Mich 390, 408-412; 919 NW2d 20 (2018), but such circumstances are limited to instances of material misrepresentations or fraud on the part of the insured when obtaining or renewing an insurance policy. This line of cases in no way stands for the proposition that an insurance company can unilaterally, after an accident, change the benefits owed under a properly purchased insurance policy in place at the time of an accident.

absolute whenever injury or damage covered by such policy occurs.' "[17] *Madar*, 152 Mich

App at 742, quoting 1 Long, The Law of Liability Insurance, § 3.25, pp 3-83-84.

It is also well settled that, as a matter of general contract law, the law in place at the

time a contract is entered into is tied to the contract terms:

> " '[T]he obligation of a contract consisted in its binding force on the party who makes it. This depends upon the laws in existence when it is made. They are necessarily referred to in all contracts, and form a part of them, as the measure of obligation to perform them by the one party and right acquired by the other.' " [*LaFontaine*, 496 Mich at 35-36, quoting *Crane v Hardy*, 1 Mich 56, 62 (1848), in turn quoting *McCracken v Hayward*, 43 US 608, 612; 11 L Ed 397 (1844).]

In the simplest terms, the thrust of this concept is that the formation and execution of a

contract occurs against the backdrop of the relevant common, statutory, and regulatory law

---

[17] Courts in other jurisdictions follow this principle in a variety of insurance contexts. See, e.g., *American Freedom Ins Co v Garcia*, 2021 IL App (1st) 200231, ¶ 39; 192 NE3d 649 (2021) ("It is public policy that, because insurance is not solely a private matter between an insurer and its insured, an injured party's rights against a liability insurer vest at the time of the occurrence giving rise to a claim."); *Viola v Fireman's Fund Ins Co*, 965 F Supp 654 (ED Pa, 1997) (holding that "[a]fter a loss has occurred, the right of the insured or his successor in interest to the indemnity provided in the policy becomes a fixed and vested right; it is an obligation or debt due from the insurer to the insured, subject only to such claims, demands, or defenses as the insurer would have been entitled to make against the original insured") (quotation marks and citation omitted); *Christian v Metro Life Ins Co*, 566 P2d 445, 449 (Okla, 1977) (holding that "[r]ights of parties become fixed at [the] time liability attaches under an insurance policy").

Admittedly, none of the previously listed cases are directly analogous to the present situation; most of them concerned general health or group health insurance policies rather than automobile insurance. In fact, only *Garcia* involved an automobile insurance policy, but it is important to note that automobile insurance in Illinois is different than the no-fault scheme that has long existed in Michigan. A lifetime guarantee to receive uncapped PIP benefits for all reasonable and necessary medical expenses following an automobile accident was unique to Michigan. No other state in the nation had such a requirement.

that exists at the time.[18]  Although a factual scenario where the law changed between the time an insurance policy was issued and the injury or loss occurred could raise questions about what law governs, the matter before us does not present such a conundrum.  The relevant laws at issue here are clear.

The United States Supreme Court long ago held that the laws in place at the time a contract is executed form a part of the contract.  See *Von Hoffman v City of Quincy*, 71 US 535, 550; 18 L Ed 403 (1866) (stating that it is "settled that the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms" and that "this principle embraces alike those which affect its validity, construction, discharge, and enforcement").  Michigan has also adopted a similar contract law principle in MCL 600.1405(2)(a) and (b), which provide that the rights of an intended beneficiary of a contract "vest[] . . . the moment the promise becomes legally binding on the promisor, unless there is some stipulation, agreement or understanding in the contract to the contrary," or if the beneficiary is "not in being or ascertainable at the time the promise becomes legally binding on the promisor then his rights shall become vested the moment he comes into being or becomes ascertainable" so long as the promise was not previously voided.  *Von Hoffman* and MCL 600.1405 dictate that Andary and Krueger, as the intended

---

[18] As we reaffirmed earlier this term, albeit in the context of considering the enforceability of a usury savings clause, "while the general rule is that the parties' contractual agreement should be 'enforced as written,' this rule does not apply if a 'provision would violate law or public policy.' "  *Soaring Pine Capital Real Estate & Debt Fund II, LLC v Park Street Group Realty Servs, LLC*, ___ Mich ___, ___; ___ NW2d ___ (2023) (Docket No. 163320); slip op at 8, quoting *Rory v Continental Ins Co*, 473 Mich 457, 470; 703 NW2d 23 (2005).

beneficiaries of the insurance policies in this case, have a clear right to enforce those insurance policies.

Pursuant to the well-settled law set forth, Andary's and Krueger's rights to PIP benefits under the applicable no-fault insurance policies vested, at the latest, when their injuries occurred and they first became eligible for PIP benefits. This is also when the insurers' legal obligation to pay PIP benefits for all reasonable and necessary medical expenses at the statutorily mandated minimum level, as incorporated into the insurance contract, was triggered.

Our prior decision in *LaFontaine* is instructive. In that case, the parties entered into an agreement granting the dealership the right to sell Dodge vehicles, defining the dealer's sales locality, and providing that the sales locality could be shared with other Chrysler dealers. The parties did not dispute that their agreement was subject to statutory protections against encroachment into a dealership's relevant market area under the then existing Motor Vehicle Dealer Act, MCL 445.1561 *et seq*., even though the agreement did not mention or even paraphrase the statutory language. *LaFontaine*, 496 Mich at 35-36. Yet, we held that the private contract incorporated any statutory protections that existed at the time it was executed. *Id*. at 37-38. In fact, this Court specifically stated that "any right LaFontaine has against encroachment by like-line dealers is a creature of statute." *Id*. at 38. We then held the parties to their preexisting agreement, despite subsequent changes to statutory law that were indisputably applicable to the contractual language. Given that *LaFontaine* held that the statutory law in place at the time of the contract's execution controlled absent a retrospective change, the same conclusion is mandated here as to a

27

contractual right to PIP benefits at the statutorily mandated level vesting no later than the time of the accident or injury.

Andary's and Krueger's preexisting vested rights to PIP benefits are even clearer than the vested rights that were disputed in *LaFontaine*. Unlike the rights at issue in *LaFontaine*, Andary's and Krueger's preexisting rights to receive uncapped PIP benefits are both statutory and contractual. Andary was a named operator and a covered person under the USAA no-fault policy purchased by her husband. Accordingly, she was an intended third-party beneficiary, and her rights under that policy vested pursuant to both common law contract principles and MCL 600.1405. As we do not have a copy of the policy purchased by Krueger's father, we cannot conclusively say whether Krueger was a listed operator on the insurance policy. However, MCL 500.3114(1), as amended by 1984 PA 372, would have mandated that the policy cover Krueger if he was domiciled in his father's home, and Citizens has been paying Krueger's PIP benefits claims since 1990. Thus, it can be inferred that Krueger's situation under the Citizens' insurance policy is analogous to Andary's.

Defendants are correct that a PIP benefits claim for a specific amount of money to pay for medical expenses does not accrue until the expense is actually incurred. MCL 500.3110(4); *Proudfoot v State Farm Mut Ins Co*, 469 Mich 476; 673 NW2d 739 (2003).[19]

---

[19] Defendants' reliance on *Proudfoot* is misplaced. That case involved an insurance dispute in which the insured needed home modifications to accommodate the plaintiff who had traumatic injuries following an automobile accident. The insurance company denied the claim. This Court affirmed the "declaratory judgment that the [contested] modifications to [the] plaintiff's home were reasonably necessary, that the amount of the allowable expense was $220,500 (plus [value added tax]), and that [the] plaintiff had supplied reasonable proof of those expenses" for purposes of MCL 500.3107. *Proudfoot*, 469 Mich at 483. The Court merely reversed the part of the judgment ordering the insurer to pay into escrow

But this fact does not change the vesting analysis at issue here: the law is well settled that the law in place at the time the parties' rights and obligations vested under a contract control absent a clear retrospective modification. While Andary and Krueger cannot seek reimbursement for specific medical expenses until the expenses are actually incurred under MCL 500.3110(4), their rights under the insurance policies for reimbursement of all reasonable and necessary medical expenses at a particular (uncapped) level, if those expenses occur, vested at the time of the automobile accidents causing their injuries—the events that triggered the coverage provided by the insurance policies.

A holding to the contrary would be nonsensical. A covered person is not required to continually renew a no-fault insurance policy or pay additional consideration to an insurer post-injury as a prerequisite to continuing to receive the uncapped PIP benefits to which they are entitled under a valid no-fault insurance policy. Thus, the contractual right to ongoing, uncapped PIP benefits cannot be analyzed in the same fashion as an executory contractual right that cannot become vested.[20] Unlike other insurance policies, uncapped

the total cost of the future modifications to the home because the "expenses in question have not yet been incurred." *Id*. Stated differently, the right to receive the PIP benefits and even the amount of the benefits were lawfully established and became vested, but the insurer could not be liable to distribute the funds until the plaintiff had actually been billed for the expenses pursuant to MCL 500.3110(4) (providing that "[p]ersonal protection insurance benefits payable for accidental bodily injury accrue not when the injury occurs but as the allowable expense, work loss or survivors' loss is incurred").

[20] See, e.g., *Black's Law Dictionary* (11th ed), p 406 (defining an "executory contract" as "[a] contract that remains wholly unperformed or *for which there remains something still to be done on both sides*, often as a component of a larger transaction and sometimes memorialized by an informal letter agreement, by a memorandum, or by oral agreement") (emphasis added); *In re Jackson*, 311 BR 195, 201 (Bankr WD Mich, 2004) ("An executory contract is 'a contract that remains wholly unperformed or for which there remains something still to be done on both sides.' ") (citation omitted).

PIP benefits are unique in that an insured accident victim's incurrence of an injury triggers an ongoing legal duty for the insurer under the insurance agreement to pay lifetime allowable medical expenses arising from the injuries caused by the accident.[21] In other words, the absence of a statutory or contractual monetary cap or policy limit for lifetime PIP benefits prior to the 2019 no-fault amendments, and the lack of an ongoing payment or performance obligation on the part of the insured, made the contractual rights held by PIP benefits recipients distinguishable from contractual rights held by individuals covered by other types of insurance policies. Pre-2019 PIP policies differ, for example, from policies containing express monetary limits for medical expenses or requiring an insured

_____

[21] We also disagree with the dissent's assertion that the contractual right held by insureds like Andary and Krueger is "less than a vested right" and the suggestion that the contractual right to receive PIP benefits for future medical expenses is a mere expectation. Payment of future medical expenses in the form of PIP benefits that are owed after a car accident resulting in catastrophic injuries is not based on hope or mere expectation but the reality that the injuries will require significant medical care. In many cases, this will mean that an insurance company is required to pay for lifetime medical care and the significant medical expenses that will be incurred because of that care. That is precisely why a lifetime guarantee of uncapped PIP benefits under the pre-2019 no-fault act and pre-2019 no-fault policies existed for catastrophic injuries arising from accidents. The only uncertainties are how much the allowable medical expenses will be and whether specific expenses or medical care are reasonable and necessary considering the nature of the injury. Moreover, under common law, the contractual right to receive future PIP benefits would be fungible and assignable like other contract rights, unless prohibited by the insurance policy. See *Northwestern Cooperage & Lumber Co v Byers*, 133 Mich 534, 538; 95 NW 529 (1903); *Burkhardt v Bailey*, 260 Mich App 636, 652; 680 NW2d 453 (2004); 2 Couch, Insurance, 3d, § 34:2, pp 34-38 ("[A] provision in a policy of insurance which prohibits its assignment except with the consent of the insurer does not apply to prevent assignment of claim or interest in the insurance money then due after loss."). The Legislature abolished assignments of contractual insurance policy rights to receive money in the future, MCL 500.3143, but insureds can still assign to their healthcare provider their rights to collect payment of specific medical expenses in the form of PIP benefits as those expenses are incurred, see *Jawad A Shah, MD, PC v State Farm Mut Auto Ins Co*, 324 Mich App 182, 196-201; 920 NW2d 148 (2018), lv den 504 Mich 987 (2019).

30

to continue paying premiums as a condition for receiving reimbursement for ongoing medical expenses.

## B. RETROACTIVITY OF THE 2019 NO-FAULT AMENDMENTS

Even though Andary's and Krueger's contractually provided PIP benefits vested at the time of their injury, we still must consider whether the 2019 amendments of MCL 500.3157 retroactively modified these uncapped lifetime benefits. We recently reaffirmed in *Buhl*, 507 Mich at 244, that *LaFontaine* sets forth our legal framework[22] for determining whether a modified statute applies retroactively:

> Retroactive application of legislation " 'presents problems of unfairness . . . because it can deprive citizens of legitimate expectations and upset settled transactions.' " We have therefore required that the Legislature make its intentions clear when it seeks to pass a law with retroactive effect. In determining whether a law has retroactive effect, we keep four principles in mind. First, we consider whether there is specific language providing for retroactive application. Second, in some situations, a statute is not regarded as operating retroactively merely because it relates to an antecedent event. Third, in determining retroactivity, we must keep in mind that retroactive laws impair vested rights acquired under existing laws or create new obligations or duties with respect to transactions or considerations already

[22] While the dissent has expressed disagreement with the retroactivity framework required by this Court's precedent, this framework has been in place for decades. See *In re Certified Questions*, 416 Mich 558, 570-571; 331 NW2d 456 (1982) (collecting cases). Our framework is also analogous to the approach used by the United States Supreme Court, see *Landgraf v USI Film Prod*, 511 US 244, 265-273; 114 S Ct 1483; 128 L Ed 2d 229 (1994), and numerous other state courts, see 2 Singer, Sutherland Statutory Construction (8th ed), § 41:2 (November 2022 update) (collecting cases). As the United States Supreme Court has recognized, a key question is "whether the new [statutory] provision attaches new legal consequences to events completed before its enactment." *Landgraf*, 511 US at 269-270. Much like the analytical framework adopted by this Court, the United States Supreme Court held that "[t]he conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." *Id*. at 270.

past. Finally, a remedial or procedural act not affecting vested rights may be given retroactive effect where the injury or claim is antecedent to the enactment of the statute. [*LaFontaine*, 496 Mich at 38-39 (citations omitted).]

The first question is thus whether there is specific language in the amended statutes that provides for retroactive application. We have long acknowledged that " 'the Legislature . . . knows how to make clear its intention that a statute apply retroactively.' " *Buhl*, 507 Mich at 245, quoting *Frank W Lynch & Co v Flex Technologies, Inc*, 463 Mich 578, 584; 624 NW2d 180 (2001).[23] As in *LaFontaine*, the question here is more difficult than one might expect. The amendments that 2019 PA 21 made to MCL 500.3157(7) and (10) appear to be prospective on their face. MCL 500.3157(7) states that the first tier in the new fee schedule applies to "treatment or training rendered after July 1, 2021 . . . ."

---

[23] Nothing in this opinion should be read as being contrary to the statement in *Ramey v Mich Pub Serv Comm*, 296 Mich 449, 460; 296 NW 323 (1941), that the presumption in favor of prospective operation can be rebutted by a clear, express command or necessary implication. However, this Court generally has not found a sufficiently clear statement of retrospective intent in the absence of a clear and express statement. See *Buhl*, 507 Mich at 245 ("In this case, nothing in the plain language of the statute suggests that MCL 691.1402a(5) was intended to apply retroactively. To the contrary, the amendment was given immediate effect without further elaboration. Furthermore, the amendment makes no mention of whether it applies to a cause of action that had already accrued before its effective date."); *Johnson v Pastoriza*, 491 Mich 417, 430; 818 NW2d 279 (2012) ("While 2005 PA 270 was given immediate effect, nothing in the statutory amendment suggests that the Legislature intended *retroactive* effect. . . . Use of the phrase "immediate effect" does not at all suggest that a public act applies retroactively."); *Brewer v AD Transp Express, Inc*, 486 Mich 50, 56; 782 NW2d 475 (2010) ("Here, 2008 PA 499 contains no language that would clearly manifest a legislative intent to apply the new jurisdictional standard retroactively. The amendment merely states the new jurisdictional standard; it contains no language suggesting that this new standard applies to antecedent events or injuries."); *Frank W Lynch & Co*, 463 Mich at 583-584 (noting two signals against retroactivity, including the lack of express language regarding retroactivity and language providing for "liability if the principal 'fails to comply with' " a section that did not exist prior to the contested legislation).

32

The limitations on family-provided attendant care in MCL 500.3157(10) apply to care "rendered in the injured person's home . . . ." Thus, on their face, these provisions only apply to treatment or services provided after the relevant effective dates. But these provisions do not explicitly address *to* whom they apply. There is nothing in the clear language of MCL 500.3157, as amended by 2019 PA 21, that suggests an intent to modify the contractual rights of an injured individual who has uncapped PIP benefits and family-provided attendant care that vested prior to the enactment of the amendments, i.e., that the amendments apply retroactively. Thus, we cannot presume that the Legislature intended the amended act to apply to treatment and care provided for those who have a vested contractual right to PIP benefits at the pre-amendment level.

Acknowledging this absence of express legislative intent for retroactive application in MCL 500.3157, defendants point to a new statutory provision created in the Insurance Code by the 2019 no-fault amendments as an implicit indicator of legislative intent for retroactive application. Specifically, defendants rely on the following passage: "An insurer shall pass on, *in filings to which this section applies*, savings realized from the application of section 3157(2) to (12) to treatment, products, services, accommodations, or training rendered *to individuals who suffered accidental bodily injury from motor vehicle accidents that occurred before July 2, 2021*." MCL 500.2111f(8) (emphasis added). As the Court of Appeals observed, this provision does not at all guarantee that there will be savings to pass on. This, however, is not the end of the analysis.

The "filings" language in MCL 500.2111f(8) does not exist in a vacuum. Critically, the savings that MCL 500.2111f(8) instructs insurers to pass on come only from "filings to which this section applies." The filings referred to are proposed insurance rates for new

33

policies that will take effect "after July 1, 2020." MCL 500.2111f(1). Another provision, MCL 500.2105(6), expressly states that the "amendments to this chapter made by the amendatory act that added this subsection apply beginning July 1, 2020." Moreover, insurance policies providing for less than uncapped PIP benefits could not be issued until July 2, 2020.[24] See generally MCL 500.2111f.

Harmonizing these provisions as we must, we acknowledge that while only treatment and services rendered after July 1, 2021, are subject to the amendments at issue, some of the amendments arguably apply to a class of persons injured *before* that date. At the earliest, the amendments apply to those individuals who were injured while covered by an insurance policy issued on or after June 11, 2019, which is the general effective date for 2019 PA 21. At the latest, these amendments apply to those individuals who were injured while covered by an insurance policy issued after July 1, 2020, that incorporated the

---

[24] The dissent cites MCL 500.3107c(1) as evidence that "[w]hen the Legislature wanted to limit the reforms to future policies, it did so expressly." This statement ignores the context of the statutory provision and the regulatory process that new insurance policies and premiums must go through before being presented to consumers. MCL 500.3107c(1) expressly applies only to policies "issued or renewed after July 1, 2020 . . . ." This subsection concerns the mandate that, rather than requiring that uncapped PIP benefits be purchased by everyone, consumers would be offered a choice about the level of PIP benefits they want to purchase moving forward. A clear statement of purely prospective application was a necessity. The Legislature could not reasonably require an insurer to reach back in time and offer its insured a choice about the level of PIP coverage for a (likely expired) insurance policy that was issued at a time when the law did not allow such a choice. To not insert a start date for this requirement would have been nonsensical. Additionally, the Legislature could have made MCL 500.3107c(1) applicable immediately on the general June 11, 2019 effective date of the no-fault amendments. Instead, it appears that a policy decision was made to align this provision with the timeline for regulatory approval of new insurance premium rates under MCL 500.2111f(1). The Legislature spoke clearly in this context, but the statement cannot be read in isolation from its context.

34

requirements of the 2019 amendments.[25] Under MCL 500.2111f(8), any savings from the class of individuals injured before July 1, 2021, who have no vested right to benefits at the pre-amendment level must be passed on in filings "after July 1, 2020." MCL 500.2111f(1). However, MCL 500.2111f(8) does not reflect a clear expression of legislative intent that MCL 500.3157(7) and (10) apply retroactively to insureds who were injured while covered by an insurance policy providing them a contractual right to provider reimbursement at the pre-amendment levels.

The second *LaFontaine* consideration is that, "in some situations, a statute is not regarded as operating retroactively merely because it relates to an antecedent event," *LaFontaine*, 496 Mich at 38-39 (citations omitted), meaning that "[m]erely because some of the requisites for its application are drawn from a time antedating its passage does not constitute a law retrospective," *Hughes v Judges' Retirement Bd*, 407 Mich 75, 86; 282 NW2d 160 (1979). In *Hughes*, the plaintiffs, both retired judges, sought an increase in their pension fund distribution amounts, claiming that they were entitled to benefit from changes made to the relevant statute after each of them had retired. While the Court determined that a judge's service prior to the enactment of the statute at issue was a necessary requirement for benefits eligibility, we held that application of the amended statute to increase their pension payments would not be a retroactive application of the law. *Id*. However, the judges were not entitled to an increase in their pension payments on a

---

[25] We need not resolve the potential tension between effective dates here because both Andary and Krueger were injured while covered by policies issued before June 11, 2019, which is the earliest possible date that the amendments could apply without impairing an insured's vested contractual rights to benefits at the pre-amendment level.

35

prospective basis because they were not contributing members of the retirement system when the amendments became effective and thus did not have the "pensionable status" that was needed to benefit from the amendments. *Id*. at 90.

Like the statute at issue in *Hughes*, MCL 500.3157(7) and (10) do not directly relate to antecedent events because, on their face, they apply to all services and care rendered after the listed effective dates. Accordingly, while application of the amended statutes to individuals like Andary and Krueger indirectly relates to antecedent car crashes and injuries, which triggered their rights to PIP benefits, this is not enough on its own to render the statute retroactive as to required benefits. But this consideration is not dispositive because, as discussed previously, the statutes are properly considered retroactive as applied to Andary and Krueger given that application would impair their vested contractual rights to PIP benefits at the pre-amendment level.

The third *LaFontaine* consideration emphasizes this Court's general disdain for retrospective laws because they can "impair vested rights acquired under existing laws or create new obligations or duties with respect to transactions or considerations already past."[26] *LaFontaine*, 496 Mich at 39. In this case, the application of MCL 500.3157(7) and (10) to Andary and Krueger would impair their vested contractual rights to PIP

---

[26] The idea that a statute that upsets preexisting contractual agreements is considered retrospective in application is hardly a new concept. The United States Supreme Court has often stated that a statute will be considered retrospective when its application would " 'tak[e] away or impai[r] vested rights acquired under existing laws, *or creat[e] a new obligation, impos[e] a new duty, or attac[h] a new disability, in respect to transactions or considerations already past*.' " *Vartelas v Holder*, 566 US 257, 266; 132 S Ct 1479; 182 L Ed 2d 473 (2012), quoting *Society for Propagation of Gospel v Wheeler*, 2 Gall 105; 22 F Cas 756, 767 (No. 13,156) (CCNH, 1814) (emphasis added; alterations in original).

36

reimbursement for medical treatment at a particular level. A no-fault insurance policy issued prior to the 2019 no-fault amendments guaranteed *uncapped lifetime PIP benefits* for those who suffered catastrophic injuries. As previously discussed, Andary's and Krueger's rights to receive no-fault PIP benefits vested on the date of the automobile crashes that caused their injuries. It is undisputed that application of the 2019 amendment of MCL 500.3157(7) to Andary and Krueger would reduce their PIP benefits by nearly half for reasonable and necessary non-Medicare-covered treatment and services they had previously been entitled to receive. For Andary, the terms of MCL 500.3157(10), if applied to her, would mean that her family could no longer be compensated for providing her reasonable and necessary attendant care beyond 56 hours per week. Thus, given that Andary has been prescribed 36 hours of in-home care per day, Andary and her family would have to consider providing uncompensated care, hiring a third-party contractor from a home health agency, or moving Andary into an in-patient or nursing home facility. Each scenario would create a new obligation or duty for Andary and her family in addition to impairing her rights.[27]

---

[27] Defendants, the dissent, and some amici suggest that applying these amendments to Andary and Krueger would not *impair* any vested contractual rights because (1) they would still be entitled to reimbursement for "reasonable" medical expenses—the amendments would simply define what constitutes "reasonable"—and (2) the amendments only limit at what level a provider can be reimbursed—they do not limit what care Andary and Krueger can receive and from whom they can receive that care. As to the first point, MCL 500.3157(7)(a) clearly and explicitly reduces reimbursement for certain services by limiting what a provider can charge by a percentage of what was provided before the amendments. While this does not explicitly limit the medical expenses to which a covered person is entitled, it has the same effect because in PIP cases, the insurance company is the payor for services provided to the insured. As previously noted, before enactment of a fixed price cap for medical care, PIP benefits recipients like Andary and Krueger were contractually (and statutorily) guaranteed lifetime coverage for all reasonable and

37

Like the circumstances in *LaFontaine*, these significant changes in the originally agreed-upon benefits were not contemplated by the insurers or the name insureds when the policies were purchased and the premiums were paid. When the insurance policies were issued and when Andary's and Krueger's injuries occurred, the policies provided no less than what the no-fault act required, and we have held that this guarantee was both contractual and statutory in nature. When the injuries occurred, the only relevant limitations on payable PIP benefits were that the lawfully provided treatment or care had to be reasonable and necessary. See MCL 500.3107, as amended by 1988 PA 312; MCL 500.3107, as amended by 2012 PA 542; MCL 500.3157, as enacted by 1972 PA 294. Application of the 2019 no-fault amendments to lower Andary's and Krueger's benefits moving forward is the inverse of the situation in *Hughes*, in which the plaintiffs sought application of the amended statute to increase the pension payments the retired judges would be entitled to receive moving forward. As a result, Andary and Krueger, as intended

---

necessary medical care arising from their automobile accident injuries, regardless of the monetary amount. If an insurance policy provides for an uncapped amount of benefits to the insured but those benefits get paid to a provider, the insured certainly has an interest in those benefits under their own insurance policy. If the Legislature wished to retroactively change a vested contractual agreement, then it needed to be clear that this was its intention. Similarly, MCL 500.3157(10) creates a new limitation on how much family-provided attendant care is reimbursable that did not exist under prior law or, presumably, the no-fault policies issued before the 2019 amendments. Thus, the amendments redefine "reasonable" in a manner that necessarily reduces the reimbursement rate for expenses related to some services and alters who can provide certain services, which affects the scope of uncapped lifetime benefits available to a covered individual. As to the second point, one does not need an advanced degree in economics to recognize that reducing reimbursement for those providing care for an insured is likely, at least to some degree, to reduce the quality and availability of such care. Accordingly, we reject the dissent's claim that this is merely a limitation on the supply of goods or services and similar arguments raised by supporting amici.

38

beneficiaries of the insurance policies, are entitled to enforce the rights that vested under the original contractual bargain absent clear legislative intent to retroactively modify that arrangement.[28]

The fourth *LaFontaine* consideration provides that a "remedial or procedural act not affecting vested rights may be given retroactive effect where the injury or claim is antecedent to the enactment of the statute." *LaFontaine*, 496 Mich at 39. Given that we have already concluded that Andary's and Krueger's rights vested at the time of their injuries, this fourth consideration does not apply, even if the amendments were intended to remedy perceived problems with the previous system of no-fault automobile insurance. See *White v Gen Motors Corp*, 431 Mich 387, 397; 429 NW2d 576 (1988) (stating that " '[t]he term "remedial" is often employed to describe legislation which is procedural in nature, i.e., it does not affect substantive rights' "), quoting 3 Sands, Sutherland Statutory Construction (4th ed), § 60.02, p 60.

The 2019 no-fault amendments at issue are almost entirely substantive in nature. Application of the 2019 amendments to individuals who had previously been injured and were already receiving PIP benefits would not "operate in furtherance of a remedy or mode of procedure," *Lynch*, 463 Mich at 584 (quotation marks and citation omitted), given that the amendments create new monetary caps on compensable non-Medicare services and a new hourly limitation on how much reimbursable attendant care can be provided by an

---

[28] While neither Andary nor Krueger are the named insureds in the insurance policies, intended beneficiaries of a contractual agreement have a statutory right to enforce the terms of the contract under MCL 600.1405 in addition to enforcement rights that exist at common law.

injured individual's family members.   Stated differently, despite being framed as limitations on what providers can charge and who can provide services, application of the amendments to Andary and Krueger would substantively reduce the monetary amount and type of benefits they have been receiving for medical services and care, which is a change in substance, not procedure.[29]

---

[29] The dissent asserts that "to the extent PIP benefits could be characterized as a 'remedy,' then any statutory reduction in the benefits which does not eliminate them altogether would pass muster under *LaFontaine*'s fourth factor."  This is flawed.  The most fundamental flaw is the notion of characterizing PIP benefits as a "remedy."  When performing a retroactivity analysis, we must examine if a statute is "remedial" or "procedural."  As explained in *In re Certified Questions*, 416 Mich at 575-576, a remedial statute is one that does not impair "the value of the contract or the substantive right," and this might include a statute that changes the remedy for enforcing the breach of a contract, eliminating a statutory defense, or altering the date from which interest for an award of monetary damages is calculated.  We also held that the Legislature's adoption of a comparative negligence scheme, under which a plaintiff's award of damages can be reduced in proportion to the degree of the plaintiff's negligence, was also remedial when applied to an implied warranty action for personal injuries.  *Id*. at 578.

PIP benefits are not a "remedial" right or remedy for the breach of a contract. Rather, PIP benefits are a contracted-for right to reimbursement for reasonable and necessary medical expenses incurred following an injury arising from a covered event.  The right to receive uncapped reimbursement for all reasonable and necessary medical expenses was a core part of the contract prior to 2019, and altering the scope of what that right includes impairs the value of the contract and the right to PIP benefits.  Insurers have an obligation to pay specific claims for benefits as a matter of contract and statute as expenses are incurred and within a reasonable time.  If any aspect of the PIP benefit scheme could be considered a remedy, it would be MCL 500.3142, which provides statutory penalties that may be assessed against an insurer if it unreasonably delays paying PIP benefits as they come due and an insured is forced to bring a lawsuit.

Moreover, the precedents cited by the dissent to support its assertion that a statute may be remedial in nature if it merely diminishes a remedy available at law rather than eliminates it are all distinguishable.  Unlike *In re Certified Questions*, 416 Mich at 570-578, this case involves a right to PIP benefits that is not just statutory but also contractual.  Further, the cases discussed in *In re Certified Questions*, 416 Mich at 575-576, were also distinguishable given that each concerned procedural rights or remedies that were not

We conclude that application of the 2019 amendments of MCL 500.3157(7) and (10) to Andary and Krueger would constitute a retroactive reduction of their vested contractual rights to receive uncapped PIP benefits pursuant to the insurance policies and incorporated statutes that existed when they were injured. The Legislature did not clearly state that it intended the new fee schedule in MCL 500.3157(7) or the new attendant care limitations in MCL 500.3157(10) to apply retroactively to individuals with a vested contractual right to PIP benefits under the pre-amendment no-fault statutes, which means that these provisions do not apply to any insured who was injured while covered by an insurance policy issued before June 11, 2019. Accordingly, the insurance policies and the disputed portion of the no-fault statutes that existed when Andary and Krueger were injured control their entitlement to PIP benefits, not the amended provisions enacted by 2019 PA 21 and 2019 PA 22.[30]

---

governed by a contract. And in *Guardian Depositors Corp v Brown*, 290 Mich 433, 440-442; 287 NW 798 (1939), the Court held that a statutorily created cause of action for a third-party beneficiary of a contract could be considered remedial, due in no small part to the fact that a lesser right already existed as a matter of equity and thus did not impair the obligations of the contract. In other words, none of the dissent's cited cases is analogous to the no-fault amendments at issue here.

[30] Our decision is limited to those individuals, like Andary and Krueger, who are entitled to PIP benefits because they were directly covered by a no-fault insurance policy at the time of their accident either as the named insured or as a covered individual under the policy. We do not decide whether individuals who have a purely statutory claim to no-fault PIP benefits, such as under MCL 500.3114(4) or MCL 500.3115, are entitled to the same protections.

Given our conclusions, it is not necessary to analyze whether retroactive application of 2019 PA 21 and 2019 PA 22 would unconstitutionally impair plaintiffs' vested contract rights under Michigan's Contracts Clause, Const 1963, art 1, § 10. Accordingly, we vacate Part II(B) of the Court of Appeals opinion that analyzes this issue and do not reach this

## V. EISENHOWER CENTER'S CHALLENGES TO PROSPECTIVE APPLICATION OF THE 2019 NO-FAULT AMENDMENTS

The Court must also decide whether the Court of Appeals erred by reviving plaintiffs' due process and equal protection challenges[31] to the prospective application of MCL 500.3157(7) and (10). In doing so, the Court of Appeals reversed the circuit court's dismissal of such claims under MCR 2.116(C)(8) on standing grounds and held that the record was inadequate to evaluate the merits of Eisenhower Center's due process and equal protection claims. The Court of Appeals did not directly address the circuit court's holdings that the plaintiffs did not have a fundamental constitutional right to PIP benefits or that the amended statutes survive rational basis review. Defendants argue that the Court of Appeals erred because Eisenhower Center is not a party to a contract with any insurer, Eisenhower Center lacks standing, and no development of the record is necessary to determine whether any due process or equal protection claim Eisenhower Center could make would survive rational basis review.

The record regarding the due process and equal protection claims plaintiffs raised is muddled because some counts in the complaint apply to all plaintiffs and others apply only to Eisenhower Center. The Court of Appeals opinion "reverse[d] the trial court's decision to dismiss Eisenhower Center's claims on the basis of standing" and held that it could not "now resolve the constitutional challenges given the lack of an adequate record, even on

---

issue, which leaves us unsure why portions of the dissent's Contracts Clause analysis criticize the majority.

[31] Michigan's Due Process Clause states that "[n]o person shall . . . be deprived of life, liberty or property, without due process of law." Const 1963, art 1, § 17. According to Michigan's Equal Protection Clause, "[n]o person shall be denied the equal protection of the laws[.]" Const 1963, art 1, § 2.

rational basis review." *Andary*, ___Mich App at ___; slip op at 14.  But the circuit court only dismissed Counts 13 to 18 for lack of standing.  These counts were pleaded by all plaintiffs and alleged due process and equal protection challenges to the prospective application of both MCL 500.3157(7) and (10) on behalf of all past and future motor vehicle accident victims and all Michigan medical providers who treat such victims in Michigan.

Eisenhower Center alone pleaded under Counts 11 and 12 that the prospective application of MCL 500.3157(7) violated its due process and equal protection rights.  The circuit court rejected and dismissed Eisenhower Center's constitutional claims on the basis that they failed under rational basis review.  These claims were not dismissed by the circuit court because Eisenhower Center lacked standing to assert them.  We address both lines of reasoning.

## A.  STANDING

"The purpose of the standing doctrine is to assess whether a litigant's interest in the issue is sufficient to 'ensure sincere and vigorous advocacy.' " *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 355; 792 NW2d 686 (2010) (citation omitted).  *Lansing Sch Ed Ass'n* restored Michigan to its "prudential doctrine" of standing, which provides that

> a litigant has standing whenever there is a legal cause of action.  Further, whenever a litigant meets the requirements of MCR 2.605, it is sufficient to establish standing to seek a declaratory judgment.  Where a cause of action is not provided at law, then a court should, in its discretion, determine whether a litigant has standing.  A litigant may have standing in this context if the litigant has a special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large or if

43

the statutory scheme implies that the Legislature intended to confer standing on the litigant. [*Id*. at 372.]

The Court of Appeals stated, with limited analysis, that "Eisenhower Center, as a provider of care and services to catastrophically injured accident victims, clearly retains a distinct and palpable injury that our decision regarding retroactive application does not resolve." *Andary*, ___ Mich App at ___; slip op at 14. But plaintiffs argued that the circuit court erred both by dismissing Eisenhower Center's individualized due process and equal protection claims and those that were pleaded on behalf of nonparties to this litigation. In other words, all plaintiffs—not just Eisenhower Center—argued that the prospective application of the 2019 no-fault amendments should be barred on equal protection and due process grounds as to future nonparties. As will be explained, we hold that the circuit court correctly concluded that plaintiffs lack standing to maintain due process and equal protection challenges as to the prospective application of MCL 500.3157(7) or (10) on behalf of nonparties.

The United States Supreme Court has long recognized that "[e]mbedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick v Oklahoma*, 413 US 601, 610; 93 S Ct 2908; 37 L Ed 2d 830 (1973). There are limited exceptions to this nonparty standing rule. "One such exception is where individuals [who are] not parties to a particular suit stand to lose by its outcome and yet have no effective avenue of preserving their rights themselves." *Broadrick*, 413 US at 611. Both this Court and the United States Supreme Court have also

44

recognized that the First Amendment overbreadth doctrine is another exception. *Id*. at 611-612; *In re Chmura*, 461 Mich 517, 530; 608 NW2d 31 (2000) (adopting *Broadrick*'s statement that an overbreadth challenge is an exception to typical nonparty standing rules). And representative standing of an organization to bring a claim on behalf of its membership is another indirect exception. See *Lujan v Defenders of Wildlife*, 504 US 555, 563-564; 112 S Ct 2130; 119 L Ed 2d 351 (1992); *Warth v Seldin*, 422 US 490, 516; 95 S Ct 2197; 45 L Ed 2d 343 (1975).

Given that plaintiffs' complaint alleges that prospective application of some 2019 no-fault amendments will violate not only their due process and equal protection rights, but also the rights of unnamed nonparties to this lawsuit, we must examine the nature of the constitutional rights at issue when determining whether plaintiffs can satisfy the previously discussed rules of standing or one of the exceptions.

The rights to due process and equal protection under the law are enumerated in the Declaration of Rights in Article 1 of Michigan's Constitution, Const 1963, art 1, §§ 2, 17, and the Fifth and Fourteenth Amendments of the United States Constitution, US Const, Ams V and XIV. Such rights are undoubtably personal and individualized in nature. See, e.g., *Bauserman v Unemployment Ins Agency*, 509 Mich 673, 691-705; 983 NW2d 855 (2022) (discussing the history and importance of Michigan's Declaration of Rights and the ability of citizens to enforce such rights). Because these rights are personal in nature, an individual generally cannot assert such rights on behalf of others. See *Chmura*, 461 Mich at 530; *Broadrick*, 413 US at 610. As explained earlier, we held that the 2019 no-fault amendments cannot reduce the PIP benefits that Andary and Krueger are entitled to receive. Their request for relief is therefore resolved on that basis. Thus, we agree with

45

the Court of Appeals that Andary and Krueger now lack a sufficiently concrete and direct interest to proceed with their constitutional challenges to the prospective application of the amended statutes, regardless of whether the circuit court's reason for dismissing these claims was proper.

Given the resolution as to Andary and Krueger, we must now turn to Eisenhower Center to determine if it can move forward with the constitutional claims originally pleaded by all plaintiffs. We must review nonparty standing cases to answer part of this question. In *Lansing Sch Ed Ass'n*, 487 Mich at 373 n 21, we noted that an organization representing the constitutional interests and claims of its members can have standing to move forward with a lawsuit. See also *Lujan*, 504 US at 563-564. But Eisenhower Center has not filed its lawsuit asserting standing as part of a membership organization of medical providers representing its individual members. Nor did it plead under Counts 13 to 18 that it was challenging the prospective application of MCL 500.3157(7) or (10) on behalf of individuals specifically under its care who were injured after the 2019 no-fault amendments became effective, even if we were to assume that it could do so for purposes of a declaratory action under MCR 2.605. Rather, Eisenhower Center attempts to litigate constitutional claims on behalf of an abstract and undefined group of potential future patients who have yet to be injured or treated and potential medical providers with whom it has no affiliation. This is too abstract and tenuous a connection to establish standing as a representative of a nonparty for purposes of litigating constitutional claims.

We are thus left with the conclusion that Eisenhower Center does not have standing to maintain due process or equal protection challenges to the prospective application of MCL 500.3157(7) or (10) on behalf of past or future patients or medical providers who are

46

not parties to this litigation. Accordingly, we reverse the Court of Appeals' decision in Part III of its opinion to the extent it held that the circuit court erred by dismissing Counts 13 to 18 under MCR 2.116(C)(8) for lack of standing.

We additionally note that, as to the prospective application of MCL 500.3157(10), the complaint in this matter does not appear to plead a prospective challenge to the new attendant care limitations on Eisenhower Center's own behalf. This is, perhaps, because by its own pleading, Eisenhower Center is a corporation "engaged in the profession of providing products, services, and accommodations for the care, recovery, or rehabilitation of individuals suffering traumatic brain injuries" who are living in an "inpatient" setting at its facilities in Ann Arbor, Michigan. There are no allegations in the complaint that Eisenhower Center is, or even can be, a family member provider of the attendant care services governed by MCL 500.3157(10). Eisenhower Center has not pleaded anything that could be read as alleging that the prospective application of MCL 500.3157(10) would cause it any damages, affect any part of its existing contract, or otherwise have any effect on its business. While it is unclear whether the Court of Appeals intended its opinion to reach the opposite conclusion, the Court of Appeals opinion is reversed to the extent it conflicts with this conclusion.

To summarize, we hold that Andary and Krueger lack standing to challenge the prospective application of the 2019 no-fault amendments because Andary and Krueger are not subject to the 2019 amendments under our previous holding, Eisenhower Center lacks standing to bring challenges to the prospective application of the 2019 no-fault amendments on behalf of nonparty past and future patients and medical providers, and Eisenhower Center has not pleaded a challenge to MCL 500.3157(10) on its own behalf.

47

These holdings do not, however, resolve Eisenhower Center's constitutional challenges to the prospective application of MCL 500.3157(7) that were pleaded on its own behalf.

## B. EISENHOWER CENTER'S DUE PROCESS AND EQUAL PROTECTION CHALLENGES TO PROSPECTIVE APPLICATION OF MCL 500.3157(7)

The Court must next determine if the Court of Appeals erred to the extent it held that the record was inadequate to determine whether Eisenhower Center sufficiently pleaded a substantive due process or equal protection challenge to the prospective application of MCL 500.3157(7) on its own behalf for purposes of MCR 2.116(C)(8). The allegations as to these claims are contained in Counts 11 and 12 of the complaint.

The test to determine whether a statute comports with substantive due process or equal protection principles is essentially the same. "Substantive due process analysis must begin with a careful description of the asserted right, for there has always been reluctance to expand the concept of substantive due process . . . ." *Bonner v Brighton*, 495 Mich 209, 226-227; 848 NW2d 380 (2014) (quotation marks, citations, and brackets omitted). "The test to determine whether legislation enacted pursuant to the police power comports with due process is whether the legislation bears a reasonable relation to a permissible legislative objective." *Shavers*, 402 Mich at 612. See also *Bonner*; 495 Mich at 227 (holding that for substantive due process purposes, "[w]here the right asserted is not fundamental, the government's interference with that right need only be reasonably related to a legitimate governmental interest").

For equal protection purposes, when no fundamental right or suspect class is involved, "a legislative classification must be sustained, if the classification itself is rationally related to a legitimate governmental interest." *Shavers*, 402 Mich at 613

48

(quotation marks and citation omitted). Stated differently, "legislation challenged on equal protection grounds is accorded a presumption of constitutionality, and it is reviewed by applying a rational basis standard." *Doe v Dep't of Social Servs*, 439 Mich 650, 662; 487 NW2d 166 (1992).

The challenged legislation is cloaked in a presumption of constitutionality under both tests. *Shavers*, 402 Mich at 613. "[A] court may uphold the constitutionality of police power legislative judgments in the face of due process or equal protection challenge by taking judicial notice of indisputable, generally known or easily ascertainable facts." *Id*. at 614. "[A] party challenging the legislative judgment may attack its constitutionality in terms of purely legal arguments (if the legislative judgment is so arbitrary and irrational as to render the legislation unconstitutional on its face) or may show, by bringing to the court's attention facts which the court can judicially notice, that the legislative judgment is without rational basis." *Id*. at 614-615 (citations omitted).

The Court of Appeals properly acknowledged these legal standards. But the majority then reversed the circuit court's dismissal of Eisenhower Center's constitutional challenges to prospective application of the 2019 no-fault amendments on the basis of another passage from *Shavers* and its conclusion that it is premature to determine whether Eisenhower Center's challenges are justiciable. Specifically, this passage in *Shavers* provided:

> There are, however, instances in which police power legislative judgments cannot be affirmed or rejected on the basis of purely legal arguments or indisputable, generally known or easily ascertainable facts which can be judicially noticed. In such instances, the facts upon which the existence of a rational basis for the legislative judgment are predicated "may properly be made the subject of judicial inquiry[.]" [*United States v*

49

*Carolene Prod Co*, 304 US 144, 153; 58 S Ct 778; 82 L Ed 1234 (1938).]
Thus, a court may require a trial so that it may establish adequate findings of facts to determine whether, on the one hand, plaintiffs have shown facts which reveal that the legislative judgment is without rational basis, or, on the other hand, whether there is *any* reasonable state of facts on the record which can be produced in support of the legislative judgment.

Such an approach is particularly necessary when the challenged police power legislation is important, complicated, novel or experimental legislation. *Borden's Farm Products Co, Inc v Baldwin*, 293 US 194, 204, 210, 212; 55 S Ct 187; 79 L Ed 281 (1934). See also *Pinnick v Cleary*, [360 Mass 1, 34-37; 271 NE2d 592 (1971)] (Tauro, C.J., concurring). [*Shavers*, 402 Mich at 615 (citation omitted).]

We disagree with the Court of Appeals' application of this aspect of *Shavers* for several reasons.

Eisenhower Center's pleadings and arguments boil down to claims that MCL 500.3157(7) will make it financially impossible for Eisenhower Center to continue running its current business model and that there is not a rational reason for the large difference in reimbursement rates between Medicare-covered services and non-Medicare-covered services under the amended statute.[32] The United States Supreme Court has recognized

---

[32] For due process purposes, Eisenhower Center pleaded that it has a protected property interest "in the survival of its business and the perpetuation of its financial operations without government interference in the form of oppressive price control legislation that threatens the survivability of" its business. Primarily, Eisenhower Center argues that the reduced reimbursement rates in MCL 500.3175(7) are so unreasonably low that Eisenhower Center will be unable to stay in business and that the low reimbursement rates will destroy its preexisting financial investments in the business. For equal protection purposes, Eisenhower Center argues that MCL 600.3157(2) and (7) create two different fee schedules that discriminate against medical providers on the basis of whether the reasonably necessary products and services they provide are compensable under Medicare laws. Eisenhower Center argues that there is no reasonable or rational reason to allow reimbursement rates at 190% to 200% of what Medicare would pay for Medicare compensable services under MCL 500.3157(2) but to limit non-Medicare compensable

that fundamental rights include "most of the rights enumerated in the Bill of Rights" and that "these liberties extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs." *Obergefell v Hodges*, 576 US 644, 663; 135 S Ct 2584; 192 L Ed 2d 609 (2015). While not always aligned, this Court has taken a similarly restrained view in expanding the concept of fundamental rights and liberties in the realm of substantive due process. See *Bonner*, 495 Mich at 227. In *Bonner* we declined to recognize a fundamental right of "an absolute repair option" for property that has become a risk to the public welfare. *Id*. at 228.

We further note that the United States Supreme Court has declined to recognize the freedom to contract as a fundamental liberty, holding that "[t]here is no absolute freedom to do as one wills or to contract as one chooses." *West Coast Hotel Co v Parrish*, 300 US 379, 392; 57 S Ct 578; 81 L Ed 703 (1937). We are unaware of any court that has recognized a fundamental right to continue a particular business model free from government regulation. We decline to recognize such a right today. Therefore, we agree with the circuit court that Eisenhower Center has pointed to no "fundamental right" of its own that has been or will be infringed for purposes of its substantive due process claim. Given this lack of a fundamental right, and pursuant to *Shavers*, 402 Mich at 612, rational basis review applies to Eisenhower Center's substantive due process challenge to the prospective application of MCL 500.3157(7).

---

services to a mere 52.5% to 55% of what providers were charging for the same services as of January 1, 2019, under MCL 500.3157(7).

We also agree with the circuit court that rational basis review applies to Eisenhower Center's equal protection challenge to the classification created by MCL 500.3157(2) and (7). This is the default standard for social and economic legislation. See *Shavers*, 402 Mich at 613; *Phillips v Mirac, Inc*, 470 Mich 415, 434; 685 NW2d 174 (2004). We have recognized that heightened scrutiny only applies when the statutory classification is based upon suspect factors, such as race, national origin, or ethnicity, or when the legislation that creates the classification impinges upon the exercise of a fundamental right. *Phillips*, 470 Mich at 432-433. A classification based on whether a medical provider is engaged in providing services that are reimbursable under Medicare laws does not rise to the level of a suspect classification warranting heightened scrutiny. Therefore, rational basis review applies to Eisenhower Center's equal protection claim.

Given that rational basis review applies to Eisenhower Center's prospective substantive due process and equal protection claims, contrary to the Court of Appeals' decision, we find that remanding for discovery and further proceedings is unnecessary. It was well known and widely reported that prior to the enactment of 2019 PA 21 and 2019 PA 22, Michigan's automobile insurance premiums had risen to among the highest in the country.[33] A key goal of the 2019 no-fault reforms was to drive down premiums for all operators of automobiles in Michigan and to curb what had been portrayed as exploitative billing by medical providers. In fact, the Legislature included in the title of 2019 PA 21

---

[33] See, e.g., Barrett, *Michigan's High Auto Insurance Rates Are Most Expensive in America*, MLive (May 2, 2019) <https://www.mlive.com/public-interest/2019/04/michigans-high-auto-insurance-rates-are-most-expensive-in-america.html> (accessed May 25, 2023) [https://perma.cc/S43P-NBS4].

and 2019 PA 22 a statement that one purpose was "to provide for the continued availability and affordability of automobile insurance . . . in this state and to facilitate the purchase of that insurance by all residents of this state at fair and reasonable rates[.]" Just as we recognized in *Shavers*, 402 Mich at 596, that the implementation of a no-fault automobile insurance system to remedy the perceived flaws of a fault-based tort system of post-accident recovery was a legitimate legislative purpose within the Legislature's police power, so too are the policy goals of making automobile insurance more affordable for Michiganders and combating bad actors.

One of several tools selected by the Legislature to rein in escalating costs was the implementation of fee schedules in MCL 500.3157 for Medicare-reimbursable and non-Medicare-reimbursable services, treatment, and products. Based on the briefing provided to the Court, it appears beyond dispute that implementation of the new fee schedules in MCL 500.3157 will, over time, affect statewide automobile insurance premiums, even if the amendments can only be applied to those who are injured or covered by a policy issued after the amendments became effective. Even without cost savings being guaranteed, the connection between the goal and the desired outcome would still be enough to survive rational basis review. Moreover, in seeking to reduce costs, the Legislature had at least a rational basis for treating reimbursement rates for Medicare compensable services differently than services that are not covered by Medicare given that it is well established that Medicare generally pays less to reimburse medical providers for treatment than most other payors, like private insurers.[34] "[T]he rational basis test does not test 'the wisdom,

_____

[34] See Congressional Budget Office, *The Prices That Commercial Health Insurers and Medicare Pay for Hospitals' and Physicians' Services* (January 2022), pp 2-3, available

need, or appropriateness of the legislation . . .' We examine the purpose with which the legislation was enacted, not its effects[.]" *Phillips*, 470 Mich at 434-435 (citation omitted). See also *Duke Power Co v Carolina Environmental Study Group, Inc*, 438 US 59, 83-84; 98 S Ct 2620; 57 L Ed 2d 595 (1978) ("That the accommodation struck may have profound and far-reaching consequences . . . provides all the more reason for this Court to defer to the congressional judgment unless it is demonstrably arbitrary or irrational.").

No further factual development is necessary to conclude that the prospective application of the new fee schedule in MCL 500.3157(7) is reasonably and rationally related to a legitimate legislative purpose, regardless of the effectiveness or wisdom of the policy. Therefore, the Court of Appeals erred by reaching a contrary conclusion in Part III of its opinion, and the circuit court did not err by concluding that Eisenhower Center's due process and equal protection challenges to the prospective application of MCL 500.3157(7) fail as a matter of law. We reverse Part III of the Court of Appeals opinion and judgment in this regard and affirm dismissal of Counts 11 and 12 of plaintiffs' complaint.

---

at <https://www.cbo.gov/system/files/2022-01/57422-medical-prices.pdf> (accessed July 11, 2023) [https://perma.cc/M7Z5-SQ9S] (explaining that commercial insurers negotiate the price paid for services with providers but the prices Medicare pays are set administratively through laws and regulations); Lopez et al, *How Much More Than Medicare Do Private Insurers Pay? A Review of the Literature*, KFF (April 15, 2020) <https://www.kff.org/medicare/issue-brief/how-much-more-than-medicare-do-private-insurers-pay-a-review-of-the-literature/> (accessed July 11, 2023) [https://perma.cc/HA5G-WUYL] ("Across all studies, payments from private insurers are much higher than Medicare payments for both hospital and physician services, although the magnitude of the difference varies[.]").

## VI. CONCLUSION

In summary, for the reasons previously discussed, we affirm in part and reverse in part the Court of Appeals opinion and judgment. We affirm Part II(A) of the Court of Appeals opinion holding that the Legislature did not clearly indicate that MCL 500.3157(7) and (10) apply retroactively to alter the vested contractual PIP benefits of previously injured individuals before the effective date of the amended statutes. We clarify that neither MCL 500.3157(7) nor (10) applies to insureds injured while covered by an insurance policy issued before June 11, 2019. We vacate as unnecessary Part II(B) of the Court of Appeals opinion analyzing plaintiffs' Contracts Clause claims premised on Const 1963, art 1, § 10. We affirm in part and reverse in part Part III of the Court of Appeals opinion discussing plaintiffs' due process and equal protection challenges to the prospective application of MCL 500.3157(7) and (10). We remand this matter to the Ingham Circuit Court for further proceedings that are not inconsistent with this opinion.

> Elizabeth M. Welch
> Elizabeth T. Clement
> Richard H. Bernstein
> Megan K. Cavanagh
> Kyra H. Bolden

STATE OF MICHIGAN

SUPREME COURT

MICHAEL T. ANDARY, M.D., Conservator
and Guardian of ELLEN M. ANDARY, a
legally incapacitated person, RONALD
KRUEGER, Guardian of PHILIP
KRUEGER, a legally incapacitated person,
and MORIAH, INC., doing business as
EISENHOWER CENTER,

        Plaintiffs-Appellees,

v                                  No. 164772

USAA CASUALTY INSURANCE
COMPANY and CITIZENS INSURANCE
COMPANY OF AMERICA,

        Defendants-Appellants.

_____

VIVIANO, J. (*concurring in part and dissenting in part*).

After many failed attempts, the Legislature in 2019 finally reached a consensus on how to address a long-simmering problem: the high cost of no-fault automobile insurance. Indeed, as the majority opinion observes, Michigan's automobile insurance rates were the highest in the nation. As a result, many Michigan residents simply could not afford the legally mandated coverage. The Legislature's solution was multifaceted, but some of the core changes involved limitations on personal protection insurance (PIP) benefits, specifically on what medical care providers could charge for future services and who could provide future attendant care services.

The majority's decision today thwarts the will of the Legislature by concluding that application of the statutory amendments would be retroactive as to pre-reform accidents. This is not so. The reforms broadly apply to *all* future medical expenses and attendant care services, regardless of when the injury occurred. This is plainly a prospective application. Worse still is the majority's misreading of the text to conclude that the reforms do not, by their terms, apply to expenses arising out of pre-reform accidents. The language of the statutes makes no distinction based on when the accident occurred. Because my reading of the statute requires me to reach plaintiffs' Contracts Clause challenge, I would conclude that this fails too.[1] The result today is that through an erroneous interpretation of the statute, aided by resort to vague and disputed concepts that seem only to serve as cover for fairness concerns, the majority has impeded the Legislature's effort to address an important issue in our state. As a result, the efforts of the Legislature and the Governor to reduce costs and make insurance more affordable for all the residents of our state will not come to fruition for many decades. If courts cannot be trusted to faithfully interpret and apply the laws, especially those involving such significant and contested topics, then the democratic process is in peril.

## I.  ANALYSIS

It is telling that the majority does not begin its analysis with the statutory text, instead opting to ponder the abstract "nature" of no-fault benefits and concluding that they

---

[1] I agree with the majority on the remaining issues in the case, specifically that Eisenhower Center lacks standing to bring certain constitutional challenges and that its other constitutional challenges fail on the merits. I would not address Andary's and Krueger's other constitutional challenges to prospective application of the reforms because those issues have not been decided in the lower courts or briefed in this Court on appeal.

are both contractual and statutory. From its determination that the benefits are partially contractual, the majority leaps to the conclusion that any change to the no-fault act impairs vested rights. This focus is misguided, however, because even if PIP benefits are statutory and contractual, the dispositive question at the outset is what the Legislature intended as evidenced by the language it used. Does that language extend to PIP benefits for future medical expenses and services arising out of a pre-reform accident? The fact that the benefits might be partially contractual does not necessarily bear upon the ordinary meaning of the statute, because the Legislature could have nevertheless attempted to reach those benefits. Even if this is somehow deemed retroactive—which it should not be, as explained shortly—that does not necessarily mean it is prohibited. See Cooley, Constitutional Limitations (5th ed), p 456 ("There is no doubt of the right of the legislature to pass statutes which reach back to and change or modify the effect of prior transactions, provided retrospective laws are not forbidden . . . by the State constitution, and provided further that no other objection exists to them than their retrospective character."); Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), pp 261-265 (noting that retroactive laws are not prohibited unless they violate a constitutional provision).[2] Only once the meaning of the statutory reforms is established, the second question comes into focus: if the amendments extend to future expenses and services

---

[2] To be sure, under our present framework, the vested-rights analysis is improperly interjected into the interpretive question. See *Buhl v Oak Park*, 507 Mich 236, 252-271; 968 NW2d 348 (2021) (VIVIANO, J., concurring) (criticizing the present test on this ground). Nevertheless, as noted below, the first factor in the present test, and the one we have stressed is the predominant consideration, is the meaning of the statutory text.

stemming from pre-reform accidents, do they run afoul of any constitutional prohibitions, specifically the Contracts Clause?

It is clear that the reforms reach future expenses from accidents that occurred prior to enactment of the statutes. Under the current test for determining retroactivity, I would not find the reforms to be retroactive. Nor do the reforms violate the Contracts Clause, because they do not substantially impair any contractual obligations. Injured persons remain entitled to all reasonably necessary medical expenses and to the same level of attendant care services that they were prior to the reforms. Rather, the reforms limit what *medical care providers* can charge and *who* can provide the attendant care. As a practical matter, this might make it more difficult to find willing providers and attendant care services, but it does not impair the insurers' legal obligation to pay these benefits.

## A. RETROACTIVITY

### 1. BACKGROUND PRINCIPLES

Our test for retroactivity involves four factors:

First, we consider whether there is specific language providing for retroactive application. Second, in some situations, a statute is not regarded as operating retroactively merely because it relates to an antecedent event. Third, in determining retroactivity, we must keep in mind that retroactive laws impair vested rights acquired under existing laws or create new obligations or duties with respect to transactions or considerations already past. Finally, a remedial or procedural act not affecting vested rights may be given retroactive effect where the injury or claim is antecedent to the enactment of the statute. [*LaFontaine Saline, Inc v Chrysler Group, LLC*, 496 Mich 26, 38-39; 852 NW2d 78 (2014) (citations omitted).][3]

---

[3] Our current test to determine the retroactivity of a statute is confusing and misguided, as I have discussed at length in *Buhl*, 507 Mich at 252-271(VIVIANO, J., concurring). Nevertheless, even accepting this as the proper approach, as the majority does, the reforms are not retroactive.

"Despite our current use of multiple principles in addition to the text when determining retroactivity, we have long emphasized that the text is the primary criterion of whether a statute applies retroactively." *Buhl v Oak Park*, 507 Mich 236, 258; 968 NW2d 348 (2021) (VIVIANO, J., concurring) (discussing our caselaw).

## 2. THE TEXT

The analysis thus begins with the statutory text. Every automobile insurance policy must include PIP benefits. MCL 500.3101(1). "Under [PIP] an insurer is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle, subject to the provisions of this chapter." MCL 500.3105(1). The first key section is MCL 500.3107(1)(a), which establishes what PIP benefits cover: "[PIP] benefits are payable for" "[a]llowable expenses consisting of reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."[4]

Before the 2019 reforms, MCL 500.3157, as enacted by 1972 PA 294, worked in conjunction with MCL 500.3107 to establish what was payable as PIP benefits. It provided that certain medical care providers (such as physicians and hospitals) rendering treatment covered by PIP "may charge a reasonable amount for the products, services and accommodations rendered. The charge shall not exceed the amount the person or institution customarily charges for like products, services and accommodations in cases not involving insurance." MCL 500.3157, as enacted by 1972 PA 294. Prior to the 2019

---

[4] There are two specified exceptions to allowable expenses, but those are not at issue here. MCL 500.3107(1)(a)(*i*) and (*ii*). In addition, PIP benefits also cover certain work losses and daily expenses, but these are not at issue here. MCL 500.3107(1)(b) and (c).

5

reforms, there were no hard limits on the amount that could be paid; a plaintiff simply had to show that the amount sought was reasonable and did not exceed customary rates. See generally *Spectrum Health Hosps v Farm Bureau Mut Ins Co of Mich*, 333 Mich App 457, 481; 960 NW2d 186 (2020) (noting that these were the two limitations on the amount healthcare providers could charge and what insurers had to pay).

The 2019 reforms limited costs associated with PIP benefits while leaving insured persons and other persons covered by insurance policies with the same basic coverage. Most directly, the Legislature created a fee schedule that limited the amount medical providers can charge. The first two subsections in MCL 500.3157 establish the primary limitations relevant here:

> (1) Subject to [MCL 500.3157 (2) to (14)], a physician, hospital, clinic, or other person that lawfully renders treatment to an injured person for an accidental bodily injury covered by personal protection insurance, or a person that provides rehabilitative occupational training following the injury, may charge a reasonable amount for the treatment or training. The charge must not exceed the amount the person customarily charges for like treatment or training in cases that do not involve insurance.
>
> (2) Subject to [MCL 500.3157(3) to (14)], a physician, hospital, clinic, or other person that renders treatment or rehabilitative occupational training to an injured person for an accidental bodily injury covered by personal protection insurance is not eligible for payment or reimbursement under this chapter for more than the following:
>
> (a) For treatment or training rendered after July 1, 2021 and before July 2, 2022, 200% of the amount payable to the person for the treatment or training under Medicare.
>
> (b) For treatment or training rendered after July 1, 2022 and before July 2, 2023, 195% of the amount payable to the person for the treatment or training under Medicare.

6

(c) For treatment or training rendered after July 1, 2023, 190% of the amount payable to the person for the treatment or training under Medicare. [MCL 500.3157(1) and (2).]

Various other subsections apply similar limitations to specific types of providers not at issue here. See MCL 500.3157(4) (applying limitations for certain facilities providing indigent care and certain freestanding rehabilitation facilities); MCL 500.3157(6) (applying limitations for hospitals that have trauma centers). There is a similar limitation for treatments and services not covered by Medicare. MCL 500.3157(7). The second limitation at issue in this case is in MCL 500.3157(10). It caps family- and friend-provided attendant care:

(10) For attendant care rendered in the injured person's home, an insurer is only required to pay benefits for attendant care up to the hourly limitation in section 315 of the worker's disability compensation act of 1969, 1969 PA 317, MCL 418.315. This subsection only applies if the attendant care is provided directly, or indirectly through another person, by any of the following:

(a) An individual who is related to the injured person.

(b) An individual who is domiciled in the household of the injured person.

(c) An individual with whom the injured person had a business or social relationship before the injury.

The provisions in MCL 500.3157 limiting medical-provider charges are very clear about what they apply to: treatment or training rendered within a specific period in the future. There is no textual indication that the Legislature meant to further limit these sections only to PIP benefits payable for accidents that occurred *after* enactment. MCL 500.3157(10) similarly offers nothing to suggest that it applies only to attendant care rendered for accidents occurring after the statute's effective date. Nowhere does the statute

7

mention the date or timing of the injury for which the treatment or training is being provided. To make matters clearer still, MCL 500.3157(14) states that "Subsections (2) to (13) apply to treatment or rehabilitation occupational training rendered after July 1, 2021." No qualification is made with regard to the date of injury.

MCL 500.2111f provides another strong textual indication that the reforms apply to pre-effective date policies. This section attempts to regulate the premiums insurers can charge. MCL 500.2111f(1) provides that before July 1, 2020, insurers must file "premium rates for [PIP] coverage for automobile insurance policies effective after July 1, 2020." The next subsection provides that the insurers' premium rates for policies up through July 2, 2028, "must result, as nearly as practicable, in an average reduction per vehicle from the premium rates for [PIP] coverage that were in effect for the insurer on May 1, 2019 as follows[.]" MCL 500.2111f(2). This section, then, is geared toward reductions in future policies. But, critically, it appears that the Legislature anticipated that those reductions would be underwritten by application of the reforms to pre-effective date policies:

> An insurer shall pass on, in filings to which this section applies, savings realized from the application of [MCL 500.3157(2) to (12)] to treatment, products, services, accommodations, or training rendered to individuals who suffered accidental bodily injury from motor vehicle accidents that occurred before July 2, 2021. An insurer shall provide the director with all documents and information requested by the director that the director determines are necessary to allow the director to evaluate the insurer's compliance with this subsection. After July 1, 2022, the director shall review all rate filings to which this section applies for compliance with this subsection. [MCL 500.2111f(8).]

In other words, the reduction of premium rates—which is indisputably the central goal of the reforms—depends, in large measure, on the application of the reforms to pre-effective date policies.

8

Like the Court of Appeals below, the majority emphasizes that MCL 500.2111f relates to *future* premiums. That is true but incomplete—MCL 500.2111f relates to *reductions* in future premium rates, but MCL 500.2111f(8) demonstrates how those reductions are to be achieved, i.e., from application of the reforms to medical expenses arising out of earlier accidents. The reference to accidents before July 2, 2021, would be largely, if not completely, meaningless if the Legislature had not intended MCL 500.3157 to apply to pre-effective date policies. Moreover, MCL 500.2111f(8) fits perfectly with the plain language of MCL 500.3157, which clearly applies to pre-effective date policies. There is no conflict between them, and we have stated that "[s]tatutes that relate to the same subject matter or share a common purpose must be read together as constituting one law" to "produce a harmonious whole . . . ." *Fradco, Inc v Dep't of Treasury*, 495 Mich 104, 115; 845 NW2d 81 (2014). This is true even if the statutes "contain no reference to one another and were enacted on different dates." *Id.* But they were enacted by the very same Legislature in two related public acts constituting the 2019 reform package.[5]

These provisions, then, regulate the activity of treatment covered by PIP benefits. They all apply to treatment rendered after the statute's effective date without regard to the date of the injury for which the treatment is being provided. This necessarily means that the reforms would apply to PIP benefits being provided under policies that predated the

---

[5] Plaintiffs claim that MCL 500.2111f(8) is irrelevant because under MCL 500.2105(6), the amendments of MCL 500.2111f "apply beginning July 1, 2020." But that start date makes sense because MCL 500.2111f applies to future premium rates. As noted, the significance of MCL 500.2111f(8) is not that it alone mandates that MCL 500.3157 apply to pre-effective date policies. Rather, the significance of MCL 500.2111f(8) is that it provides contextual support for reading MCL 500.3157 as applying to pre-effective date policies.

statute. When the Legislature wanted to limit the reforms to future policies, it did so expressly. In MCL 500.3107c(1), for example, it enacted a requirement that applied only to policies "issued or renewed after July 1, 2020 . . . ." This section mandated that insurers offer consumers the choice of various levels of PIP benefits for each "loss occurrence." MCL 500.3107c(1)(d). But the Legislature did not limit the fee schedule and attendant care limitations to future policies—only to future treatment.[6]

The statutory text is very clear about what it regulates: future treatment. While the activity might relate to pre-reform policies providing the coverage, this isn't enough to deem the statute retroactive. See *LaFontaine*, 496 Mich at 39. The regulated activity is treatment that occurs *after* the statute's effective date. There is no textual hook on which to hang an argument that the future treatments are only those stemming from post-reform injuries. For these reasons, I would hold that the statute applies to pre-reform accidents and that such application is not retroactive. The statute regulates activity that will occur post-enactment. The fact that it relates to pre-reform accidents is not enough to make it retroactive. See *LaFontaine*, 496 Mich at 38-39.

In reaching the contrary conclusion, the majority holds the text to a much stricter standard than our normal interpretive methods require. In particular, the majority

---

[6] As the majority points out, MCL 500.3107c(1) requires that consumers be offered various levels of PIP benefits, which would, of necessity, apply to insurance policies entered into in the future. Nevertheless, that the Legislature expressly prescribed such application to future policies indicates its awareness that other aspects of the reforms would govern pre-reform policies.

emphasizes the supposed silence in the statute on the topic of retroactivity, which it then says is insufficient to justify a supposedly retroactive application to pre-reform accidents.[7]

But it is simply inaccurate to say that the statute is silent on this point. The ordinary meaning of the new language in MCL 500.3157 plainly covers *all* future expenses and services, which, of course, includes those arising from pre-reform accidents. MCL 500.3157(14) confirms this reading, and MCL 500.2111f(8) removes all doubt. The majority can point to no language suggesting that the scope of these provisions is somehow narrower than what their ordinary meaning encompasses. The notion that the statute is silent is thus simply untrue. The majority's distorted interpretation will lead to real and widespread consequences, given that a significant effort to reform a troublesome area of social policy is significantly impeded.[8]

---

[7] Contrary to the majority's apparent premise, our caselaw does not require explicit reference to retroactivity. Instead, until today at least, we have long said that retroactive application can be found by express command *or* necessary implication. See, e.g., *Ramey v Mich Pub Serv Comm*, 296 Mich 449, 460; 296 NW 323 (1941) (noting that retroactive application would not be found without express command or " 'by necessary, unequivocal and unavoidable implication from the words of the statute taken by themselves and in connection with the subject matter, and the occasion of the enactment, admitting of no reasonable doubt' "), quoting Endlich, Interpretation of Statutes (1888), § 271, p 362; 2 Singer, Sutherland Statutory Construction (7th ed, November 2020 update), § 41:4 ("[A] law is not construed as retroactive unless the act clearly, by express language or necessary implication, indicates that the legislature intended a retroactive application.").

[8] Under the approach to retroactivity I laid out in *Buhl*, 507 Mich at 262 (VIVIANO, J., concurring), I would end my analysis here, with the text. "When the text answers the interpretive question, any approach that forces courts to carry the analysis beyond the text is an invitation to mischief." *Id*. Indeed, the majority opinion displays all the faults in our current approach to retroactivity, allowing the majority to use vague concepts like vested rights to invoke a presumption against retroactivity (which the majority supercharges by suggesting that the Legislature must explicitly make the statute retroactive). The introduction of these concepts creates confusion about the core interpretive task, which is "whether the statutory text retroactively extends to past events, not whether it can

11

### 3. VESTED RIGHTS

With regard to the third factor, PIP benefits for future treatment are not vested rights. This is largely because an injured person covered by PIP has no immediate entitlement to PIP benefits for future treatment.[9] Under MCL 500.3142(1), PIP "benefits are payable as loss accrues." And PIP "benefits payable for accidental bodily injury accrue not when the injury occurs but as the allowable expense, work loss or survivors' loss is incurred." MCL 500.3110(4). Moreover, injured persons covered by PIP are prohibited from assigning "benefits payable in the future . . . ." MCL 500.3143 ("An agreement for assignment of a right to benefits payable in the future is void."). Consequently, in regulating future PIP benefits, the Legislature in the 2019 reforms was regulating something that had not yet occurred—i.e., future treatments and the payments for them—and for which covered injured persons have no immediate right.

Thus, a statute that limits how much a plaintiff can receive in future PIP benefits relating to expenses not yet incurred does not affect any present right held by the plaintiff. In these circumstances, the plaintiffs have something less than a vested right. As Justice Cooley described it, " 'It would seem that a right cannot be considered a vested right, unless it is something more than such a mere expectation as may be based upon an anticipated

---

constitutionally do so." *Id*. at 267. Nevertheless, as explained, even under *LaFontaine*, the majority has gone astray, and I thus address the *LaFontaine* factors here to show how.

[9] With regard to the second factor, as discussed above, the reforms here certainly "relate[] to an antecedent event," i.e., the pre-reform injury. *LaFontaine*, 496 Mich at 38-39. But as *LaFontaine* observes, this relationship is not enough to make a law retroactive. *Id*. I thus agree with the majority's analysis on this factor, which concludes that "while application of the amended statutes to individuals like Andary and Krueger indirectly relates to antecedent car crashes and injuries, which triggered their rights to PIP benefits, this is not enough on its own to render the statute retroactive as to required benefits."

continuance of the present general laws: it must have become a title, legal or equitable, to the present or future enjoyment of property, or to the present or future enforcement of a demand, or a legal exemption from a demand made by another.' " *Cusick v Feldpausch*, 259 Mich 349, 352; 243 NW 226 (1932), quoting 2 Cooley, Constitutional Limitations (8th ed), p 749. "[A] mere expectation of property in the future is not considered a vested right . . . ." Cooley, Constitutional Limitations (5th ed), p 440. An "expectation is not property," Cooley explained, because "it cannot be sold or mortgaged," among other things. *Id*. at 441. As we have further explained, " 'Rights are "vested" when the right of enjoyment, present or prospective, has become the property of some particular person or persons as a present interest.' " *Wylie v City Comm of Grand Rapids*, 293 Mich 571, 586; 292 NW 668 (1940) (citation omitted).

In the present circumstances, plaintiffs do not have anything more than the expectation of receiving payment in the future *if* they incur reasonable expenses. As the Court of Appeals has recognized, persons in plaintiffs' position cannot assign the claim until then because it is not vested against the insurer. *Mich Ambulatory Surgical Ctr v Farm Bureau Gen Ins Co of Mich*, 334 Mich App 622, 627 n 2; 965 NW2d 650 (2020) (" 'After a loss occurs, the indemnity policy is no longer an executory contract of insurance. It is now a vested claim against the insurer and can be freely assigned or sold like any other chose in action or piece of property.' "), quoting 17 Williston, Contracts (4th ed), § 49:126, pp 130-132.[10] At most, plaintiffs had a contingent right to benefits. But contingent rights

---

[10] As Williston notes, the nature of the contract prior to the loss (or, as here, incurring the expense), is executory. There does not appear to be much caselaw on whether such contracts can vest rights in the parties. But at least some cases have held that they do not. See *Woodcliff Mgt v North Bergen Twp*, 127 NJ Super 123, 125; 316 A2d 494 (Law Div,

are not vested rights.  See *Wylie*, 293 Mich at 586 (" 'Now, what is a vested right?  Without reference to a dictionary definition, we would define it as a right, so fixed, that it is not dependent on any future act, contingency or decision to make it more secure.' . . . 'A vested right is a present or future right to do or possess certain things not dependent upon a contingency.' ") (citations omitted); 2 Singer, Sutherland Statutory Construction (8th ed, November 2022 update), § 41:4 (" 'Vested rights' refers generally and by negative inference to property and contract entitlements that are not expectancies, contingencies, or remedies.").[11]

---

1974) ("It cannot be denied that the possession of moneys acquired through a consummated transaction has a vested characteristic which is distinguishable from a contract right that is only executory in nature.  The latter right may be impaired by legislation which is reasonably necessary for the protection of the public within the ambit of police power reserved to the legislature."); cf. *South Hamilton Assoc v Mayor & Council of Morristown*, 99 NJ 437, 447; 493 A2d 523 (1985) ("Executory contract rights, although they do not have the sanctity of vested rights, are protected against the unfettered discretion of a municipality."); *White v Martin*, 66 Tex 340, 344; 17 SW 727 (1886) ("When this point was reached, there existed an executory contract which gave the purchaser a vested right, *upon complying with his part of the contract*, to have the land purchased, of which subsequent legislation cannot deprive him.") (emphasis added); but see 8 Corbin, Contracts (rev ed), § 30.5, p 8 (concluding that rights in executory contracts should be considered vested based on the author's critique of the concept of vested rights).

[11] The majority contends that the only thing uncertain about the expenses is "how much [they] will be and whether specific expenses or medical care are reasonable and necessary considering the nature of the injury."  That is simply not so—more fundamentally, it will be unclear at the time of the accident what medical services will be necessary far into the future.  That is why the right to benefits is entirely contingent and relies on there being future acts of needing and receiving reasonably necessary medical services.  Because it is dependent on a future act, contingency, or decision, the right to PIP benefits does not fit within the basic definition of vested rights.  See *Wylie*, 293 Mich at 586.

Moreover, it is unclear what point the majority hopes to make by observing that under the common law, the claims for benefits would be assignable.  As the majority acknowledges, the Legislature has prohibited assignments.  We generally do not make law by plucking alternative background rules from a multiverse of different legal worlds.  And

14

And to the extent that plaintiffs are simply relying on the continuance of the laws as a vested right, they are doomed to fail. " 'There can, in the nature of things, be no vested right in an existing law which precludes its change or repeal.' " *Wylie*, 293 Mich at 589, quoting *Harsha v Detroit*, 261 Mich 586, 594; 246 NW 849 (1933). In *Wylie*, we noted that the original legislation allowed plaintiffs to "receive sums over and beyond those to which they were entitled under the city charter, and the effect of the repealing acts of 1939 was to prevent this consequence. In the last analysis, plaintiffs' rights sprang from the kindness and grace of the legislature. And it is the general rule that that which the legislature gives, it may take away." *Id*. at 588.

We have applied these general principles in cases that implicate contractual rights. This has occurred in the context of workers' compensation. In *Lahti v Fosterling*, 357 Mich 578, 581; 99 NW2d 490 (1959), the plaintiff was injured on the job. At the time, the workers' compensation law limited the medical benefits for which the employer was liable. *Id*. at 582-583. A year later, however, the Legislature expanded workers' entitlement to medical benefits. *Id*. at 583. The plaintiff claimed that the statute applied retroactively, while defendant said that the cause of action accrued under the old statute and that therefore subsequent amendments could not enlarge the plaintiff's rights. *Id*. Our Court noted the

---

even if the common-law rules governed here, it is not apparent to me that there could be an assignment of the right to *future* benefits before the medical expenses are incurred. As the majority admits, Court of Appeals caselaw allows insured persons to assign PIP benefits claims to medical providers, but this is limited to benefits for expenses that have already been incurred. *Jawad A Shah, MD, PC v State Farm Mut Auto Ins Co*, 324 Mich App 182, 196-201; 920 NW2d 148 (2018). Regardless, those medical providers would have a direct cause of action for the benefits "for products, services, or accommodations provided to [the] insured person." MCL 500.3112.

15

general rule that statutory rights (and, in *Lahti*, defenses) were based on legislative grace and could be taken away. *Id*. at 591. But we also cited caselaw indicating that liability under the workers' compensation law is contractual. *Id*. at 592.[12]

We then observed various cases suggesting that legislatures could affect contracts when changing the law. We noted a United States Supreme Court dissent addressing the Contracts Clause, which said, " 'For, so nearly universal are contractual relationships that it is difficult if not impossible to conceive of laws which do not have either direct or indirect bearing upon contractual obligations. Therefore, it would go far towards paralyzing the legislative arm of State governments to say that no legislative body could ever pass a law which would impair in any manner any contractual obligation of any kind.' " *Id*. at 593 (emphasis omitted), quoting *Wood v Lovett*, 313 US 362, 382; 61 S Ct 983; 85 L Ed 1404 (1941) (Black, J., dissenting). We also noted our own caselaw:

---

[12] See *id*. at 592 (" 'Liability under the workmen's compensation law is contractual . . . .' "), quoting *Schmidt v Wolf Contracting Co, Inc*, 269 App Div 201, 207; 55 NYS2d 162 (1945); *Lahti*, 357 Mich at 594 (" '[T]his court has held, we believe correctly, that the basis of liability of employers under the workmen's compensation statutes, is contractual.' "), quoting *Peak v State Compensation Comm'r*, 141 W Va 453, 459; 91 SE2d 625 (1956), rev'd on other grounds by *Maxwell v State Compensation Dir*, 150 W Va 123 (1965), overruled by *Sizemore v State Workmen's Compensation Comm'r*, 159 W Va 100 (1975). It is worth noting that *Schmidt* had actually stated, earlier in the opinion, that the liability was not contractual; the portion of the opinion we cited assumed it was contractual to show that the outcome would be no different. Nevertheless, it is noteworthy that we framed the quotation as we did and placed it alongside other caselaw addressing legislation that affected contractual relationships.

Later, in *Romein v Gen Motors Corp*, 436 Mich 515, 532; 462 NW2d 555 (1990), we somewhat confusingly cited *Lahti* for the proposition that "workers' compensation benefits and liabilities are statutory in origin . . . ." In light of the above, however, it is apparent that *Lahti* understood that changes to the workers' compensation laws impacted contract rights. In this way, as in the no-fault context, while the origin of the right might be statutory, the right is effectuated through contractual relationships.

16

Justice SHARPE in the case of *Allen v. Kalamazoo Paraffine Co.*, 312 Mich 575, 576, 577[; 20 NW2d 731 (1945)], said:

> "Defendants offered to pay compensation for the lesser amount and urge on appeal that the right to compensation arises from the contractual relation between the employer and employee; and that the compensation act in force at the time the contractual relations were entered into governs the substantive rights and obligations of the parties.
>
> We are not in accord with this theory. Defendant company elected to accept the benefit of the act providing for workmen's compensation as well as such amendments to the act as the legislature might deem proper to make. See *Cooley v. Boice Brothers*, 245 Mich 325[; 222 NW 768 (1929)]." [*Lahti*, 357 Mich at 593-594.]

Given this authority, we concluded that "no vested right or contractual right exists that prohibits the legislature from making a change in the remedies afforded employees under the workmen's compensation law . . . ." *Id*. at 595.

*Lahti* thus supports the proposition that a statutory entitlement can be retroactively amended without impairing vested rights even if the statute affects contractual relations. Importantly, *Lahti* involved a Contracts Clause challenge, as did *Romein v Gen Motors Corp*, 436 Mich 515, 531; 462 NW2d 555 (1990), which similarly found that retroactive application was constitutional when there were "no vested rights in the amount of liability [for workers' compensation benefits] established at the time of an injury."[13]

---

[13] The majority, like the Court of Appeals, attempts to distinguish this caselaw by claiming that the workers' compensation system is purely statutory whereas the no-fault PIP benefits have a contractual as well as statutory basis. This is not so. Indeed, we have analogized the no-fault system to the workers' compensation system in that both are social-welfare programs outside various constitutional protections, including the Contracts Clause. See *Franks v White Pine Copper Div*, 422 Mich 636, 654; 375 NW2d 715 (1985), superseded by statute on other grounds. And as can be plainly seen above—and will be discussed more below with regard to the Contracts Clause issue—the Court in *Lahti* (and *Romein*)

Plaintiffs and the majority rely on vague statements in the caselaw to suggest that rights vest at the time of the accident. For example, in *Proudfoot v State Farm Mut Ins Co*, 469 Mich 476, 478; 673 NW2d 739 (2003), the plaintiff sought payment of PIP benefits (and declaratory relief providing that those benefits were owed) covering the cost of home modifications, but those costs had not yet been incurred. We rejected the claim to the money judgment because under MCL 500.3110(4), the costs had not yet been "incurred," defined in the opinion as " '[t]o become liable or subject to, [especially] because of one's actions.' " *Id*. at 484 (citation omitted). While we upheld the lower court's order providing declaratory relief as to future benefits, we merely stated that "[a] trial court may enter 'a declaratory judgment determining that an expense is both necessary and allowable and the

addressed the question as though contractual rights were at stake. The analysis was premised on the Legislature's ability to enact amendments that affect contracts.

Moreover, in some ways the workers' compensation system mirrors the no-fault system quite well. The plaintiffs in the present cases were not parties to the no-fault insurance contract, just as employees would not be parties to any contract between their employer and an insurer providing coverage for workers' compensation liability. Cf. *Lahti*, 357 Mich at 592 (noting caselaw addressing and rejecting the argument that amendments to workers' compensation laws unconstitutionally impair the contract between an employer and its insurer). In both cases, the injured persons would be, at best, third-party or incidental beneficiaries of the contract. See, e.g., *Blackwell v Citizens Ins Co of America*, 457 Mich 662, 668 n 4; 579 NW2d 889 (1998) ("We note that plaintiff [employee in a workers' compensation action] may reasonably be viewed as an intended third-party beneficiary of the contract between [the insurer] and her employer."). And in the workers' compensation sphere, in addition to any insurance contract, there is also the contract between the employer and employee that might be affected by statutory changes. Thus, in the caselaw discussed above, and again below, courts have accepted that legislative action may affect contractual relationships. In addition, as noted above, as in the workers' compensation system, individuals injured by automobiles can be entitled to no-fault benefits regardless of whether any insurance policy applies to the accident. See note 2 of this opinion; MCL 500.3114(4). Finally, it is worth noting again that this analysis is a long way from the statutory text—the difficult question about whether a statute impacts vague vested rights tells us very little about what the statutory language means.

18

amount that will be allowed[, but s]uch a declaration does not oblige a no-fault insurer to pay for an expense until it is actually incurred.' " *Id*. (citation omitted; second alteration by the *Proudfoot* Court).

In other words, as the Court of Appeals has subsequently observed, there is no *present* duty to pay until the expense is incurred. See *Vanbibber v Progressive Mich Ins Co*, unpublished per curiam opinion of the Court of Appeals, issued November 20, 2018 (Docket No. 339753), pp 2-3 ("In sum, *Proudfoot* stands for the proposition that the trial court can establish the future obligation, if any and in what amount, of defendant to pay for plaintiff's home modifications; but defendant is not obligated to actually make payment until the expense is actually incurred."). And if there is no present duty to pay, there is no present right to be paid. See *Karmol v Encompass Prop & Cas Co*, 293 Mich App 382, 389-390; 809 NW2d 631 (2011) (discussing MCL 500.3110(4) and *Proudfoot* and concluding that "a claimant's right to PIP benefits arises when the claimant finds himself or herself on the hook for an expense"); *Allard v State Farm Ins Co*, 271 Mich App 394, 400; 722 NW2d 268 (2006) ("Until the expense is incurred, the insured's entitlement to benefits does not accrue and the insurer's liability to pay the claim does not attach.").

For these same reasons, other stray lines in the caselaw are no more helpful to the majority. In *Madar v League Gen Ins Co*, 152 Mich App 734, 742; 394 NW2d 90 (1986), the Court of Appeals stated that "[r]ights created under an insurance policy become fixed as of the date of the accident." We have cited this line for the proposition that "[t]he rights and obligations of the parties [in a no-fault case] vested at the time of the accident." *Clevenger v Allstate Ins Co*, 443 Mich 646, 656; 505 NW2d 553 (1993). But neither *Madar* nor *Clevenger* discussed the concept of vested rights, nor did either case involve limitations

19

on the Legislature's authority to affect such rights. Instead, the cases involved efforts by the parties themselves to void coverage once an accident occurred.

*Madar*, for example, addressed the issue whether an insurer was bound under a policy when the insured had transferred his ownership of the vehicle. *Madar*, 152 Mich App at 736. The court noted the general rule that insurers cannot annul or cancel policies after the insured is injured. *Id*. at 742. Indeed, *Madar* explained the rule as resulting not from any notion of the plaintiff's rights but because allowing such cancellations would affect the Legislature's statutory scheme. *Id*. ("It is clear that the policy behind this principle is to prevent an insurer from retroactively cancelling coverage on a date prior to the date of the accident in order to shift liability to another insurer under the priority provisions of the no-fault act.").[14] *Clevenger* added nothing to the analysis, simply citing the Court of Appeals caselaw. As in *Madar*, the question was whether an insurer could avoid a policy on the ground that the vehicle's previous owner had never cancelled it after selling the vehicle. *Clevenger*, 443 Mich at 647-650. See also *Cason v Auto Owners Ins Co*, 181 Mich App 600, 609; 450 NW2d 6 (1989) (citing *Madar*'s language about "fixed" rights in a case in which the plaintiff sought benefits from the insurer of a previous vehicle owner when the policy had never been cancelled). This caselaw addressed attempts to completely cancel properly established and ongoing insurance policies. It is simply

_____

[14] It is worth noting that this rule, which formed the basis for *Clevenger*'s statement about vesting, is incomplete at best. Equitable circumstances exist in which an insurer can rescind a no-fault contract after an accident occurs. See *Bazzi v Sentinel Ins Co*, 502 Mich 390, 400-401; 919 NW2d 20 (2018) (noting that common-law defenses may be raised to rescind no-fault policies). This goes to show that *Madar* and the related caselaw were not purporting to offer a full discussion of the topic or address the larger concept of vested rights.

20

inapplicable to the present question whether hypothetical future PIP benefits constitute vested rights of the sort that the Legislature cannot touch.

The majority also cites out-of-state caselaw to support the assertion that an insured's rights under an insurance contract vest when an accident occurs. But like our caselaw, none of it addresses whether the insured has vested rights as against legislative amendment. And most of what the majority cites is dicta.[15] If anything, some of the caselaw bolsters the conclusion that the rights to hypothetical future medical expenses and services are not vested. For example, in *Arkansas Blue Cross & Blue Shield, Inc v Foerster*, 38 Ark App 228, 231; 832 SW2d 280 (1992), the issue was whether an insurer was responsible to pay for expenses incurred after the policy was no longer in effect. The court noted the distinction between policies that cover accidents and policies that cover expenses, explaining that the former gives rise to liability when the accident occurs but that in the latter, "it is the incurring of expenses which is considered the contingency that gives rise

---

[15] In *Viola v Fireman's Fund Ins Co*, 965 F Supp 654, 656 (ED Pa, 1997), the question was whether an insurer could limit the insured's ability to assign its rights under a policy after an event giving rise to the insurer's liability occurred. The court did not consider whether an insured had a vested right in possible future medical expenses not yet incurred. And, in any event, the court ultimately found that the policy did not apply, so any discussion of its applicability was dicta. *Id*. at 666. The majority's citation of *Christian v Metro Life Ins Co*, 566 P2d 445, 448 (Okla, 1977), is even less relevant, as it involved a disability insurance policy, the rights under which vested when the insured employee became "permanently disabled . . . ." And in *American Freedom Ins Co v Garcia*, 2021 IL App (1st) 200231, ¶ 39; 192 NE3d 649 (2021), the court addressed a dispute between insurers as to who was liable for coverage regarding an accident. The court only briefly noted the injured party's rights arising at the time of the accident and only to support the conclusion that an injured person is a necessary party to a declaratory action to determine the insurer's coverage under the policy. *Id*.

to the insurer's liability." *Id.*[16]  Many other cases note this basic distinction.  See, e.g.,

*Member Servs Life Ins Co v American Nat'l Bank & Trust Co of Sapulpa*, 130 F3d 950,

954 (CA 10, 1997) (" '[C]overage under a medical insurance policy or plan is normally

triggered by one of two events.  If a policy insures against illness, coverage for all medical

costs arising from a particular illness vests when the illness occurs.  If a policy insures

against expenses, coverage vests when the expenses are incurred.' ") (citation omitted).

As discussed above, in the present context, the insurer's liability results from the

incurring of a medical expense in the context of the no-fault act.  It is, at the very least,

arguable that with regard to PIP benefits for future medical expenses and services, no-fault

policies are more appropriately classified as medical expense insurance, vesting when the

expenses are incurred.[17]

---

[16] Further, in *Arkansas Blue Cross*, the court determined that the policy triggered the insurer's liability only for incurrence of medical expenses—anything said about accident policies was dicta.  *Arkansas Blue Cross*, 38 Ark App at 234.

[17] In any event, the present case well displays why the vague concept of vested rights is a poor fit for answering the interpretive question of whether a statute's language applies retroactively.  Rather than grounding the concept in the constitutional principles from which it emerged, see 2 Singer, Sutherland Statutory Construction (8th ed, November 2022 update), § 41:4, treating it as simply a factor in the interpretive analysis incentivizes courts to do what the majority has done here: latch on to stray lines in cases mentioning "vested" or "fixed" rights but having nothing to do with the doctrine.  While I admit that the concept has long been used in the retroactivity analysis, it muddies the waters by obscuring the constitutional provisions and principles that are imperiled by a statute, as courts refer to vested rights without any discussion of the constitutional provisions at stake.  *Id*. ("Additionally, courts may invoke the principle that retrospective statutes impairing vested rights violate a Constitution without citing a specific constitutional provision and without using descriptive language indicating which constitutional provision or provisions are involved.").  The end result is that courts tend to rely on their own perceptions of fairness to guide the analysis.  Cf. *id*. ("The perpetuation of vested-rights 'reasoning' continues to muddle retroactivity doctrine.  Practical considerations that illuminate whether the retroactive application of a new law is fair and just may provide more meaningful standards

Even assuming that vested rights are at stake in this case, it is difficult to see how they are affected in a legally meaningful manner. Under the contracts and the statute, plaintiffs are entitled to medical expenses, which are defined in the no-fault act. The USAA Casualty Insurance Company policy does go further and states that "[t]here is no maximum dollar amount for reasonable and necessary **medical expenses** incurred for a **covered person's** care, recovery, or rehabilitation." Amicus CPAN cites this provision as being directly impaired by the 2019 reforms.

Yet, as Amici Insurance Alliance of Michigan and the National Association of Mutual Insurance Companies point out, the fee-schedule reform does not purport to limit the amount of PIP benefits a covered person can receive. Rather, MCL 500.3157 limits the amount a provider can charge for treatment or a service. It does not limit a covered person's entitlement to medical expenses. From this perspective, any effect on the covered persons is simply a product of market forces—when the providers can charge less, they are less likely to provide the service. That seems to be the main complaint from amici supporting plaintiffs: injured persons will not get treatment because providers will not offer it. The majority glibly observes that "one does not need an advanced degree in economics to recognize that reducing reimbursement for those providing care for an insured is likely, at least to some degree, to reduce the quality and availability of such care."[18] But neither

of judgment than catchpenny phrases or equivocal concepts."); 8 Corbin, Contracts (rev ed), § 30.5, p 8 (contending that the term "vested rights" was a "troublesome term[]" often "used to explain a decision without explaining it" and that the "ideas behind [it] are so variable and uncertain as to make [its] use both deceptive and confusing").

[18] More seriously, the majority claims that there was no "statutory or contractual monetary cap or policy limit for lifetime PIP benefits" before the reforms. It then suggests that these pre-reform policies "differ, for example, from policies containing express monetary limits

23

plaintiffs nor the majority has pointed to any authority standing for the proposition that the effect of a law's regulation of privately provided services can deprive third parties of vested rights. Many laws regulating an industry might reduce the supply of goods or services in that industry. Yet, there appears to be no support for the notion that this effect on the overall market deprives the industry's consumers of vested rights. Cf. *American Economy Ins Co v State*, 30 NY3d 136, 152; 87 NE3d 126 (2017) (rejecting a Contracts Clause challenge and noting that the fact that insurers' contracts became less profitable was "a risk inherent in the insurance market, especially in a highly regulated market such as workers' compensation insurance, where '[t]he allocation of economic benefits and burdens has always been subject to adjustment' ") (citation omitted).[19]

The same basic analysis applies to the limitations in the 2019 reforms on family/friend attendant care—maybe even with greater force. Plaintiffs have not pointed

---

for medical expenses or requiring an insured to continue paying premiums as a condition for receiving reimbursement for ongoing medical expenses." As noted multiple times, however, the insured and covered persons have the same uncapped entitlement to benefits as they did before the reforms—the only difference is that medical providers are prohibited from charging more than certain rates. And no one contends that insureds must continue to pay premiums to receive benefits for past injuries—it is unclear what work rejecting that strawman argument does in the majority opinion.

[19] The majority rejects this reasoning but fails to explain why limiting the prices medical providers can charge somehow limits an individual's entitlement to PIP coverage. The majority admits that the reforms do not "explicitly" limit entitlement to PIP benefits. This does not matter to the majority, however, because it apparently believes the effect of the reforms will limit the availability of medical services. If this is true, however, then any regulation of the medical profession that caps the prices that the profession can charge or otherwise reduces supply would affect the vested rights of individuals entitled to reimbursement for medical expenses under an insurance policy. The implications of this reasoning are vast and could significantly limit the Legislature's ability to address pressing policy concerns.

24

to anything in the policies that entitles them to unlimited attendant care by family or friends. Indeed, they do not cite anything in the policies that mentions attendant care at all. Nor did the pre-reform statutes purport to give a direct right to such attendant care. And in any event, the reforms do not limit how much attendant care an injured party can receive. Rather, they limit who may provide that care.

Finally, it is worth noting a significant oversight in the majority's analysis: it fails to account for purely statutory claims under the no-fault act that may be brought. For instance, "a person who suffers accidental bodily injury arising from a motor vehicle accident while an occupant of a motor vehicle who is not covered under a personal protection insurance policy . . . shall claim personal protection insurance benefits under the assigned claims plan . . . ." MCL 500.3114(4). The majority's analysis here seemingly would not extend to these individuals, who had been involved in an accident with an uninsured driver. Likewise, "a person who suffers accidental bodily injury while not an occupant of a motor vehicle shall claim personal protection insurance benefits under the assigned claims plan . . . ." MCL 500.3115. That is, if an injured person not occupying a vehicle was injured and was not covered under a policy as described in MCL 500.3114(1), the person only has a purely statutory cause of action under MCL 500.3115. It would appear that pre-reform accidents which fell under these provisions are purely statutory and thus outside the scope of the majority's analysis.

Thus, I do not believe that any vested rights are affected by the reforms.

## 4. REMEDIAL RULES

Finally, the fourth *LaFontaine* factor states that remedial or procedural rules not affecting vested rights can be given retroactive effect. *LaFontaine*, 496 Mich at 39. The majority notes that because of its conclusion that vested rights are affected, the statute cannot be remedial or procedural. It further observes that because the reforms go to the substance of what plaintiffs are entitled to, they are substantive rather than procedural.

To be sure, our caselaw on this factor is hemmed with qualifications. We have suggested that a remedial statute is one focused on procedure, i.e., one that does not affect substantive rights. See generally *Buhl*, 507 Mich at 269 (VIVIANO, J., concurring) (discussing our caselaw). And we have questioned whether the factor adds any insight into the retroactivity analysis. *Id*. at 269 n 5. Nevertheless, the concept of remedial statutes and our caselaw on them lend support for the conclusion that a statute reducing the benefits to which an individual is entitled can still be remedial. Justice Cooley described remedial laws broadly:

> As a general rule, every State has complete control over the remedies which it offers to suitors in its courts. It may abolish one class of courts and create another. It may give a new and additional remedy for a right or equity already in existence. And it may abolish old remedies and substitute new; or even without substituting any, if a reasonably remedy still remains." [Cooley, Constitutional Limitations (5th ed), p 444 (citations omitted).]

As long as the right is not completely eliminated or impaired, the Legislature has authority to alter the remedy. *Id*. at 445.

Under this broader conception of remedial laws, to the extent PIP benefits could be characterized as a "remedy," then any statutory reduction in the benefits that does not eliminate them altogether would pass muster under *LaFontaine*'s fourth factor. We

26

characterized a similar reduction as remedial in *In re Certified Questions*, 416 Mich 558; 331 NW2d 456 (1982). The question in that case was whether the statutory adoption of comparative negligence principles in product liability actions could be " 'applied to an implied warranty action accruing and sued upon prior to the enactment of the statute and brought to trial after the effective date of the statute.' " *Id*. at 562. The effect of the statute was to greatly reduce what the plaintiffs could recover in the action. But we nevertheless concluded that the statute was remedial and that it applied. *Id*. at 580.

More pertinent still, we noted that even in cases involving contract remedies, "the Legislature may modify, limit, and even alter the *remedy* for enforcement of a contract without violating the rule against retrospectivity. Thus, such a new act would fall into rule four because it does not completely deny a remedy with such restrictions that it impairs the value of the contract or the substantive right." *Id*. at 575, citing *Guardian Depositors Corp of Detroit v Brown*, 290 Mich 433, 439-440; 287 NW 798 (1939). We noted numerous other cases in which we upheld application of statutes that diminished—but did not eliminate—remedies. *In re Certified Questions*, 416 Mich at 575-576. In keeping with that caselaw, we held that the comparative negligence statute could be applied because it simply changed the available remedy. *Id*. at 577-578. It was, in other words, a remedial statute.[20]

---

[20] *Id*. at 578 ("Since the Legislature has adopted comparative negligence as a principle which reduces plaintiff's damages in proportion to the amount of his negligence, such legislation operates to improve and further a remedy. As [our caselaw] make[s] explicitly clear, legislation with such a purpose is remedial in nature."); see also *White v Gen Motors Corp*, 431 Mich 387, 395 n 7; 429 NW2d 576 (1988) (noting caselaw upholding the distinction between statutes that reduce benefits and statutes that eliminate benefits altogether and finding that the former can be applied retroactively); cf. *Denham v Bedford*,

It appears that the 2019 reforms would fit into this caselaw on remedial statutes. To the extent that PIP benefits are a remedy that can be sought in a legal action, the Legislature's changes to the nature of the remedy are remedial in nature and can be applied retroactively. This seems particularly apt here because, as noted, plaintiffs are still entitled to all the expenses and services they were before the reforms. The changes affect only who can provide some of those services and whether some other private actors might decline to provide services when the prices are capped.

## 5. CONCLUSION

In light of the above analysis, I conclude that the 2019 reforms, by their terms, apply to medical expenses and services stemming from pre-reform accidents and that this is not a retroactive application.

## B. CONSTITUTIONAL CHALLENGES

## 1. CONTRACTS CLAUSE

Because the reforms apply to plaintiffs Andary and Krueger, I must address their constitutional challenges to the statutes. Their first claim is that the application of the reforms to them violates the constitutional protection against the impairment of contracts. The Contracts Clause states, "No state shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." US Const, art I, § 10. Under United States Supreme Court caselaw, the inquiry centers on whether the state law has operated as a substantial impairment of a contractual relationship. See *Energy Reserves Group, Inc v Kansas Power & Light Co*,

_____

407 Mich 517, 529; 287 NW2d 168 (1980) ("The Legislature . . . may modify the remedy for enforcement of a contract without impairing its obligation.").

28

459 US 400, 411; 103 S Ct 697; 74 L Ed 2d 569 (1983).[21] This inquiry has three components: the existence of a contractual relationship, whether a change in law impairs that relationship, and whether the impairment is substantial. See *Gen Motors Corp v Romein*, 503 US 181, 186; 112 S Ct 1105; 117 L Ed 2d 328 (1992). If there has been a substantial impairment, then to be valid under the Contracts Clause, the statute must pass two additional requirements: (1) "the legislative disruption of contract expectancies [must] be necessary to the public good" and (2) "the means chosen by the Legislature to address the public need [must be] reasonable." *In re Certified Question*, 447 Mich 765, 777; 527 NW2d 468 (1994).

The central question is whether the 2019 reforms substantially impair the contractual relationship.[22] As an initial matter, for many of the reasons discussed above

---

[21] We interpret the state Contracts Clause in the same manner as the federal Contracts Clause. See *Blue Cross & Blue Shield of Mich v Governor*, 422 Mich 1, 22; 367 NW2d 1 (1985).

[22] Defendants do not seem to challenge whether a contractual relationship exists. The majority notes that plaintiffs appear to be intended third-party beneficiaries of the contract and that under MCL 600.1405 they have "the same right to enforce [the] promise that [they] would have had if the . . . promise had been made directly to [them] as the promisee[s]." It is not clear to me whether the power to enforce a promise extends to allow constitutional challenges to legislation allegedly affecting the contract or that it somehow qualifies as creating a relationship for purposes of the Contracts Clause analysis. It appears that courts are split on whether a Contracts Clause claim can be brought by third-party beneficiaries. Compare *In re DeWitt Estate*, 54 P3d 849, 859 (Colo, 2002) (en banc) ("As the named beneficiary to the contracts at issue, neither DeWitt nor Fasi are parties to the contract. They are merely third-party beneficiaries to the contract, the parties to which are the insurer and the decedent-insured. . . . As such, both fail to satisfy the threshold requirement of a contract clause claim, namely that there is a contractual relationship."), with *United States v Manning*, 434 F Supp 2d 988, 1023 (ED Wash, 2006) (finding that a Contracts Clause claim brought by a third-party beneficiary was ripe). But because the parties have not raised this issue, it would be inappropriate to resolve the case on this basis.

29

with regard to vested rights, it is not at all clear how any impairment exists here. "[A] contract is 'impaired' when a law undermines a party's ability to legally enforce that contract[.]" *AFT Mich v Michigan*, 497 Mich 197, 209; 866 NW2d 782 (2015). The 2019 reforms do not prevent any covered person from legally enforcing defendants' obligation to pay reasonable expenses. Indeed, as noted, MCL 500.3157 limits what medical providers can charge but does not limit a covered person's entitlement to medical expenses. The impairment argument boils down to the proposition that price caps can reduce supply, thereby rendering covered persons less able to obtain care. But no one has explained how this market-based effect prevents a party from legally enforcing the insurance policy. Nor has anyone demonstrated that enforcement of a promise to pay for attendant care—without specifying *who* could provide such services—is undermined by a statute limiting reimbursement for attendant care by certain individuals but otherwise leaving the entitlement to such care uncapped. Consequently, while the reforms might have practical consequences, they do not legally undermine enforcement of the contracts.

To the extent that there was any legally relevant impairment, it was not substantial. The context in which these contracts were entered is relevant to the analysis because the Contracts Clause analysis considers "whether the impairment disrupts reasonable contractual expectations." *Elliott v Bd of Sch Trustees of Madison Consol Sch*, 876 F3d 926, 934 (CA 7, 2017); see also Note, *The Constitution, the Legislature, and Unfair Surprise: Toward a Reliance-Based Approach to the Contract Clause*, 92 Mich L Rev 398, 403-404 (1993) ("The Court's early Contract Clause decisions hinged on what this Note terms the 'traditional reliance model.' In these cases, the Court looked to the private

30

expectations the impaired contract reflected to determine whether a Contract Clause violation had occurred.").

The United States Supreme Court has observed that parties' reasonable expectations are affected by the extent of regulation in and the nature of the relevant field. See *Energy Reserves Group, Inc*, 459 US at 413 ("The threshold determination is whether the Kansas Act has impaired substantially ERG's contractual rights. Significant here is the fact that the parties are operating in a heavily regulated industry."); cf. *Fed Housing Admin v Darlington, Inc*, 358 US 84, 91; 79 S Ct 141; 3 L Ed 2d 132 (1958) ("Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end."). The insurance field, in general, is a highly regulated area. See 16A CJS, Constitutional Law (May 2023 update), § 616 ("It has been observed that, for purposes of determining whether a statute violates the Contract Clause, insurance carriers are engaged in a heavily regulated industry and thus can have no reasonable expectation that the law will remain unchanged. Accordingly, in light of [the] highly regulated nature of [the] insurance industry, legislative change does not necessarily operate as a substantial impairment of contractual rights.") (citation omitted). Our no-fault system, in particular, involves a complex web of statutes and regulatory actions that have been amended multiple times over the years. See *Titan Ins Co v Hyten*, 291 Mich App 445, 460; 805 NW2d 503 (2011) ("In decreeing no-fault insurance compulsory for all motorists, the Legislature contemporaneously undertook to highly regulate the business of insurance companies offering no-fault insurance policies in this state."), rev'd on other grounds 491 Mich 547 (2012).

31

This observation about heavily regulated industries was made in cases involving Contracts Clause challenges to our workers' compensation system, which was discussed above. *Romein*, for example, involved a Contracts Clause challenge to a statute that deemed the past coordination of worker benefits "underpayments" that were owed to the employees. *Romein*, 436 Mich at 523. In other words, employers had to reimburse employees for past coordination of workers' compensation benefits. We gave alternative reasons for rejecting the claim that this violated the Contracts Clause. First, we cited two past cases to hold that the Contracts Clause did not apply in this context because the "benefits and liabilities in the workers' compensation statute do not create rights protected by the Contract Clause." *Id*. at 533-534. In reaching this decision, one of the cases cited, *Franks v White Pine Copper Div*, explained that

> [a]ll the social welfare programs—workers' compensation, unemployment compensation, social security old age, disability, and survivors benefits, *no-fault automobile benefits*, aid to families with dependent children, and general assistance—are directed to the same objective, income maintenance. All these programs are funded by impositions on employers and others of mandatory payments (to the government, insurers or, in the case of the self-insured, to the beneficiary), with statutorily prescribed benefits. In providing for such benefits, the Legislature did not covenant not to amend the legislation.
>
> Income-maintenance benefits payable under a legislatively mandated social welfare program are not property protected by the Due Process Clause, the Contract Clause, or the Takings Clause from substantive change by subsequent legislation irrespective of whether the recipient contributed to the cost of funding the benefit or of whether the program replaces a tort remedy which has been abolished. [*Franks v White Pine Copper Div*, 422 Mich 636, 654; 375 NW2d 715 (1985) (emphasis added), superseded by statute on other grounds.]

32

Thus, significantly, *Franks* stated that the no-fault system was a legislatively mandated social-welfare program that was not protected by the Contracts Clause.

The other case cited in *Romein* was *Lahti*, 357 Mich at 593-594, in which the Court found that employment contracts were not impaired by retroactive changes to workers' compensation laws. This was true even though we approvingly cited the statement that " 'the basis of liability of employers under the workmen's compensation statutes, is contractual.' " *Id*. at 594, quoting *Peak v State Compensation Comm'r*, 141 W Va 453, 458-459; 91 SE2d 625 (1956), rev'd on other grounds by *Maxwell v State Compensation Dir*, 150 W Va 123 (1965), overruled by *Sizemore v State Workmen's Compensation Comm'r*, 159 W Va 100 (1975).[23] We could "not say that such [a] contractual relationship or liability necessarily precludes a subsequent legislature from effecting changes in the workmen's compensation laws. Those who enter into such contractual relationships do so with knowledge of the right and power of the legislature to enact any new law relating to the subject matter, not in conflict with any constitutional provision, and must be presumed to have agreed to any such change.' " *Lahti*, 357 Mich at 594-595 (citation omitted). *Lahti* thus found no Contracts Clause violation even though it accepted that the Legislature was affecting contractual bargains.

As an alternative rationale for rejecting the Contracts Clause challenge in *Romein*, 436 Mich at 534, we stated that even if the Contracts Clause applied, there was no substantial impairment of a contract. This was because the workers' compensation statutes constituted "a remedial scheme of compensation for injuries otherwise subject to recovery

---

[23] The majority notes that elsewhere in *Romein* we stated that "workers' compensation benefits and liabilities are statutory in origin . . . ." *Id*. at 532.

33

in tort actions . . . ." *Id*. Further, we observed that "[t]he party to a contract who has entered into a highly regulated industry may not remove their contract from state restrictions merely by making a contract purportedly immune from legal limitation." *Id*. at 535.

The United States Supreme Court affirmed our decision in *Romein*. See *Gen Motors Corp*, 503 US 181. The Court repeated some of the points we made and included others. In particular, the Court upheld the statutes because they simply changed the remedies available under the contract. *Id*. at 189-190. Even though a change of remedies could impair a contract, the Court found that the statute at issue "did not change the legal enforceability of the employment contracts here. The parties still have the same ability to enforce the bargained-for terms of the employment contracts that they did before the 1987 statute was enacted." *Id*. at 190.

Much the same could be said of the 2019 reforms at issue here. The contracts remain enforceable according to their terms. Any change is to the extent of enforcement. The industry is highly regulated, and a strong application of the Contracts Clause here could inappropriately restrict legislative action. For these reasons, and the others given above, I do not believe that there has been a substantial impairment of the contracts.

In arguing to the contrary, plaintiffs note the general principle that contracts incorporate the law in existence at the time they are entered. The majority notes the same principle in its determination that the statute is inapplicable to future medical expenses and services arising from pre-reform accidents.[24] This is yet another vague and contested

---

[24] The majority also confusingly states that "the law is well settled that the law in place *at the time the parties' rights and obligations vested* under a contract control absent a clear retrospective modification." (Emphasis added.) It is not entirely clear whether the majority

concept being thrown up as cover for conclusions that run counter to the statutory text and constitutional principles. As an initial matter, even assuming the no-fault statutes were incorporated into the policies when they were entered, this does not mean the amendments impaired any contractual obligation or vested rights. Insurers must still pay all reasonable expenses, including all attendant care expenses. The only difference is that the individuals and entities charging those expenses cannot charge as much, and family and friends providing the attendant care cannot do so for more than a certain number of hours per week. This undoubtedly makes it more difficult for plaintiffs to find care but does not affect the insurers' obligation to pay for care.

Moreover, the scope and meaning of the principle is unclear. We have described it as follows:

> " '[T]he obligation of a contract consisted in its binding force on the party who makes it. *This depends upon the laws in existence when it is made*. They are necessarily referred to in all contracts, and form a part of them, as the measure of obligation to perform them by the one party and right acquired by the other.' " The doctrine asserted in that case . . . applies to laws in reference to which the contract is made, and forming a part of the contract. [*LaFontaine*, 496 Mich at 35-36, quoting *Crane v Hardy*, 1 Mich 56, 62-63 (1848), in turn quoting *McCracken v Hayward*, 43 US 608, 612; 11 L Ed 397 (1844).]

Some courts have suggested that the incorporated laws can constitute implied terms protected by the Contracts Clause. See, e.g., *Colon de Mejias v Malloy*, 353 F Supp 3d 162, 174 (D Conn, 2018) ("These incorporated laws, in turn, may create implied

---

believes the statutory law becomes fixed at the time the contract is entered or when rights vest under the contract. If the latter, then the majority appears to leave open the possibility that the Legislature could apply amendments to statutes after a contract is entered but before an injury occurs.

contractual obligations that, while not expressly stated in a contract, may nonetheless provide a basis for a Contract Clause claim."). This principle has been applied to insurance contracts, see 2 Couch, Insurance, 3d (June 2023 update), § 19:1, and we have said that the statute must be read together with the policy as if it were part of the contract, see *Rohlman v Hawkeye-Security Ins Co*, 442 Mich 520, 525 n 3; 502 NW2d 310 (1993).

But how the principle applies is unclear and contested. See generally Feldman, *Statutes and Rules of Law as Implied Contract Terms: The Divergent Approaches and a Proposed Solution*, 19 U Pa J Bus L 809, 810-811 (2017) ("Despite the doctrine's pervasive theoretical and practical importance as a 'silent factor in every contract,' courts have failed to articulate a consistent, convincing policy and doctrinal rationale."). It is nearly impossible to say which laws are applicable or relevant to a contract. *Id*. at 818. Indeed, as noted earlier, we have observed that " '[f]or, so nearly universal are contractual relationships that it is difficult if not impossible to conceive of laws which do not have either direct or indirect bearing upon contractual obligations.' " *Lahti*, 357 Mich at 593, quoting *Wood*, 313 US at 382 (Black, J., dissenting).

For these reasons and others, a leading authority on contract law stated that the "principle 'cannot be accepted as correct,' because the statutes and rules of law 'are certainly not incorporated into the contract.' " 21 Feldman, Tennessee Practice Series, Contract Law & Practice (September 2022 update), § 8:24, quoting Corbin, Contracts (2d ed), § 551, p 197.[25] This has led even the United States Supreme Court to acknowledge

---

[25] Professor Feldman has articulated other problems with a broad conception of the principle:

> The implied incorporation of laws doctrine, as currently employed, resists principled application. In theory, the implied incorporation theory

that "it is somewhat misleading to characterize laws affecting the enforceability of contracts as 'incorporated terms' of a contract . . . .' " *Gen Motors Corp*, 503 US at 189, quoting 3 Corbin, Contracts (2d ed), § 551, pp 199-200.

For that reason, the Court expressed a more limited view on the incorporation principle, in line with the quotation above from *LaFontaine*: generally, laws are implied into contracts "only when those laws affect the validity, construction, and enforcement of contracts." *Gen Motors Corp*, 503 US at 189. Thus, it was only because the contracts would be unenforceable without the surrounding legal provisions that courts characterized those provisions as being incorporated into the contract. *Id*. Under this view, laws can "prescribe[] the legal operation of the contract and not the factual interpretation of its terms." *Statutes and Rules of Law*, 19 U Pa J Bus L at 853; see also *Sharp v Interstate Motor Freight Sys*, 442 SW2d 939, 948 (Mo, 1969) (en banc) (Welborn, Commissioner, dissenting) (" '[A]fter the terms of a contract have been interpreted, its legal operation can be determined only with due reference to all applicable constitutions, statutes and doctrines of the common law; but this is not a rule of Interpretation and the statutes and rules of law

---

makes every relevant statute the basis for a breach of contract action where a party fails to abide by the law during performance. The doctrine markedly increases each party's economic risk by broadening their exposure to an array of unstated laws and to a default and litigation. Also, the benefiting party has given no consideration to the other party to shoulder this extra risk. Thus, the implied incorporation doctrine, with its heavy reliance on the parties' fictionalized intent, adds little to the law of contracts, but injects significant risk and uncertainty for the stability of commercial relationships, as well as unfairness. To further complicate matters, the category of statutes, regulations, or other doctrines of law pertaining to the validity, construction, and enforcement of a contract is not self-defining. [21 Feldman, Tennessee Practice Series, Contract Law & Practice (September 2022 update), § 8:26 (citation omitted).]

are certainly not incorporated into the contract.' "), quoting 3 Corbin, Contracts (2d ed), § 551, p 197.

In this vein, it would not appear that laws become "terms" at all in a sense relevant to typical contractual analysis. They are not parts of the bargain but background rules governing whether and how it would be enforced. To hold otherwise and treat all relevant laws as actual terms in the contract "would protect against all changes in legislation, regardless of the effect of those changes on bargained-for agreements" and "would severely limit the ability of state legislatures to amend their regulatory legislation. Amendments could not take effect until all existing contracts expired, and parties could evade regulation by entering into long-term contracts." *Gen Motors Corp*, 503 US at 190.

As such, it is unclear why the Legislature would be constrained by the Contracts Clause from changing such rules regarding enforcement when the change does not prevent enforcement of any preexisting rights but, at most, simply changes the extent of the remedy. As noted at length above, the laws concerning remedies can be amended without violating the Contracts Clause. In short, the majority should not blithely repeat this complicated principle without carefully considering its scope and operation. If it is applicable at all, it offers questionable and limited support to plaintiffs.

Accordingly, I do not believe the reforms violate the Contracts Clause because they do not substantially impair the insurers' contractual obligations under the insurance policies. Rather, as noted, they cap prices charged by private third parties and limit the class of persons who can provide unlimited attendant care. Our caselaw confirms that such amendments do not unconstitutionally affect the legal enforceability of a contract for purposes of the Contracts Clause. Indeed, we have gone so far as to suggest that the no-

fault act was a social program outside the scope of the Contracts Clause. See *Franks*, 422 Mich at 654.

Even if there has been a substantial impairment of the contractual relationship, a statute can nevertheless be deemed constitutional under the last two prongs of the Contracts Clause analysis: the disruption was necessary to the public good, and the means chosen were reasonable. *In re Certified Question*, 447 Mich at 777. As a general matter, we have warned against a strict review of potentially retroactive legislation with regard to due-process challenges, which similarly ask whether there is a rational purpose behind the legislation. In *Romein*, we noted the statement from the United States Supreme Court that " '[i]t is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality . . . .' " *Romein*, 436 Mich at 525, quoting *Pension Benefit Guaranty Corp v R A Gray & Co*, 467 US 717, 729; 104 S Ct 2709; 81 L Ed 2d 601 (1984). We further stated that applying "a stricter standard of review to a workers' compensation statute simply because it operates *retroactively* would put the judiciary in the business of 'allocat[ing] the interlocking economic rights and duties of employers and employees upon workmen's compensation principles' although this is a task within the province of the Legislature." *Romein*, 436 Mich at 526, quoting *Usery v Turner Elkhorn Mining Co*, 428 US 1, 15; 96 S Ct 2882; 49 L Ed 2d 752 (1976) (alteration by the *Romein* Court). Given the similarities between *Romein* and the present case (which I have discussed above), the same principles should guide our analysis of the question presented here.

In this case, any disruption was certainly in furtherance of objectives we have deemed to be acceptable public goals, and the means chosen were reasonably related to

39

those objectives. The purpose clause in 2019 PA 21 establishes numerous reasons for the reforms, including "to provide for the continued availability and affordability of automobile insurance and homeowners insurance in this state and to facilitate the purchase of that insurance by all residents of this state at fair and reasonable rates[.]" In upholding the no-fault system against a due-process challenge, we noted that one of the objectives of the system was to reduce insurance premiums and lower costs in the insurance system. See *Shavers v Attorney General*, 402 Mich 554, 628; 267 NW2d 72 (1978). These were legitimate goals, and the challenged aspects of the scheme were reasonably related to this objective. *Id*. at 629-630. This was true even though the results were not yet apparent. *Id*. It appears that here, any disruption was necessary to reduce premiums because the legacy costs stemming from pre-reform accidents appear to have been a significant cause of rising premiums. That is why MCL 500.2111f indicated that insurers would likely obtain savings from applying the fee schedule and attendant care limitations to pre-reform accidents.

These mechanisms were reasonably related to legitimate public objectives. Defendants and amici have presented substantial evidence that no-fault insurance was costly prior to the reforms and that the reforms have already lowered rates. Of course, the reforms do not need to be effective to be constitutional; they only need to be rationally related to legitimate objectives. And here, the Legislature's decision to cap the charges of medical providers and limit friend/family attendant care passes muster. A cost cap is a blunt tool, but it certainly limits costs. And the Legislature could legitimately believe that reducing attendant care services from family and friends would reduce fraud or abuse and result in cost savings. Accordingly, even if the reforms substantially impaired contracts, I

40

would uphold them because they were necessary for the public good and reasonably related to their legitimate objectives.

For all these reasons, I would therefore reverse the Court of Appeals' judgment to the contrary.

## 2. OTHER CONSTITUTIONAL CHALLENGES

With regard to the other constitutional challenges raised in this case, I agree with the majority that "Eisenhower Center lacks standing to bring challenges to the prospective application of the 2019 no-fault amendments on behalf of nonparty past and future patients and medical providers, and Eisenhower Center has not pleaded a challenge to MCL 500.3157(10) on its own behalf." Because of its resolution of the retroactivity question, the majority does not address Andary's and Krueger's due-process and equal-protection challenges to the prospective application of the reforms. We did not request or receive briefing on this question. I therefore would not resolve it now. Nevertheless, it is worth noting that these claims appear weak for many of the same reasons the majority offers when rejecting Eisenhower Center's similar claims. I further agree with the majority's conclusion that the Court of Appeals erred by remanding the case for discovery on Eisenhower Center's claim that prospective application of MCL 500.3157(7) violates its due-process and equal-protection rights. The majority properly determines that under a rational-basis standard of review, there is no need for discovery to determine that Eisenhower Center's claims must fail.[26]

___

[26] In the course of its analysis, the majority states: "We are unaware of any court that has recognized a fundamental right to continue a particular business model free from government regulation. We decline to recognize such a right today." While this might be so, I would note that other constitutional claims may be appropriate when governmental

41

## II. CONCLUSION

The majority's decision today undermines the Legislature's efforts to address one of the most significant issues facing the state. The result is troubling, not just for what it means in this case but also for what it portends. The judiciary's primary role in our system of separated powers is to faithfully apply the laws written by the Legislature unless those laws violate the Constitution. If we cannot be trusted to do so, then the democratic process breaks down, as it has today. The majority has eschewed a fair and reasonable reading of the statutory text and instead makes loose use of vague and open-ended concepts such as vested rights. This opens the door for the majority to enact its vision of fairness in a highly contested matter of policy affecting the entire state. As a result, the cost-reducing effects of the reforms passed by the Legislature and signed into law by the Governor will not fully be felt for many decades.

Where, as here, there are no constitutional infirmities with a statute, courts have a duty to enforce the law as written. The majority fails to do so today, and I therefore dissent.

David F. Viviano
Brian K. Zahra (except as to footnotes 2, 3, and 8)

---

action shuts down a business. In particular, we recently ordered argument in a case raising the issue of whether "temporary impairment of business operations" constitutes a taking under the state and federal Constitutions. *Gym 24/7 Fitness, LLC v Michigan*, ___ Mich ___, ____; 986 NW2d 150 (2023). The present case might very well be distinguishable from the circumstances presented there, in which businesses were ordered to cease in-person activities. But it is important to note that nothing in the majority's analysis here bears on this question.

S T A T E   O F   M I C H I G A N

SUPREME COURT

MICHAEL T. ANDARY, M.D., Conservator
and Guardian of ELLEN M. ANDARY, a
legally incapacitated person, RONALD
KRUEGER, Guardian of PHILIP
KRUEGER, a legally incapacitated person,
and MORIAH, INC., doing business as
EISENHOWER CENTER,

          Plaintiffs-Appellees,

v                                                                                    No. 164772

USAA CASUALTY INSURANCE
COMPANY and CITIZENS INSURANCE
COMPANY OF AMERICA,

          Defendants-Appellants.

_____

ZAHRA, J. (*dissenting*).

     I join Justice VIVIANO's dissent in full except for footnotes 2, 3, and 8.  I decline to

address the validity of the retroactivity framework set forth in the unanimous opinion of

*LaFontaine Saline, Inc v Chrysler Group, LLC*,[1] in a case where both the majority and

dissenting opinions apply *LaFontaine*'s framework to reach their respective conclusions.

                                      Brian K. Zahra

---

[1] *LaFontaine Saline, Inc v Chrysler Group, LLC*, 496 Mich 26; 852 NW2d 78 (2014).